THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GLEN RICHARDSON, Defendant-Appellant.

First District (1st Division)   No. 76-138

Opinion filed June 20, 1977.

James Geis and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Timothy Quinn, and Mary C. Shropshire, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

After a bench trial, defendant, Glen Richardson, was convicted of armed robbery, rape and aggravated kidnapping and sentenced to three concurrent terms of imprisonment of 8 to 24 years.

Defendant now appeals and contends as follows: (1) that the trial court improperly excluded a defense witness' identification of the prosecutrix; (2) that the prosecutor's impeachment of a defense witness was improper because such impeachment was (a) based on matters not relevant to the issue at trial, (b) based on stricken testimony, and (c) based on the testimony of a witness whose identity was not made known to the defendant; (3) that the defendant was unfairly limited in presenting testimony to explain an apparent prior inconsistent statement; and (4) that the trial court erred in entering judgment and imposing sentence on both the charge of rape and the charge of aggravated kidnapping.

We affirm.

At trial, the prosecutrix testified that at approximately 1 a.m. on March 19, 1974, she drove into a parking lot reserved for tenants of her building at 421 Melrose Avenue in Chicago. At this time, the prosecutrix noticed another car enter the lot behind her. As the prosecutrix parked her car and retrieved a suitcase from the back seat, she noticed another man, whom she identified in court as the defendant, Glen Richardson, exit his vehicle and approach hers. The defendant had a small black gun in his hand and told the prosecutrix to give him all her money. She gave the defendant $30 or $40 she had in her purse. Told she could leave, the prosecutrix proceeded to the back door of her building carrying her suitcase. Changing his mind, the defendant told her to hide her suitcase in a small alcove in the parking lot and get into his car, a late model Ford LTD. The prosecutrix did as she was told and sat in the front seat on the passenger's side of defendant's vehicle.

The defendant then drove through an alley and double-parked in front of the prosecutrix' building for several minutes. During this period the prosecutrix made three attempts to escape and each time the defendant grabbed her by the neck and closed the car door. After the third attempt, the defendant held a knife to her throat for five minutes. The defendant then drove around for approximately half an hour, entered an alley, and parked there for approximately half an hour. While in the alley,

Richardson changed positions in the front seat of his car with the prosecutrix. He then told her to undress and had intercourse with her against her will in the front seat of his car. The prosecutrix testified that she did not scream out or resist Richardson's advances because she feared for her life.

After this first act of intercourse was completed Richardson permitted the prosecutrix to exit the automobile to urinate alongside the automobile. After the prosecutrix reentered the automobile, Richardson engaged her in conversation briefly, told her to undress again, and had intercourse with her again against her will in the same manner as before. The prosecutrix then dressed and Richardson asked her to be his girl friend, a request he made repeatedly throughout the remainder of the time she was with him.

Richardson then continued to "cruise for quite a while." While they were stopped at the corner of Diversey and Sheridan, the prosecutrix saw a police car some distance away and stopped on Sheridan. Although she believed the door on the passenger side to be unlocked, the prosecutrix did not attempt to escape because she knew defendant was armed.

At approximately 3 a.m., Richardson stopped within two blocks of the prosecutrix' apartment and again asked her to be his girl friend. Thinking it was the only way to get out of her situation, the prosecutrix gave Richardson her correct name and telephone numer. She explained that she feared Richardson would verify this information before allowing her to leave and feared an angry reaction if she lied. After writing the name and telephone number on a piece of paper, Richardson drove to within a half block of the prosecutrix' apartment and allowed her to exit.

The prosecutrix walked to the foyer of her building and encountered Mr. Floyd, the doorman. She told Mr. Floyd that she had just been robbed and raped. This was corroborated by Mr. Floyd who was called at trial as a witness for the State. Mr. Floyd also testified that the prosecutrix seemed distraught, that she was pale and her clothes were disheveled. Her legs seems wobbly and she drew back from him as he tried to steady her. Mr. Floyd suggested that she call a doctor.

The prosecutrix went on to testify that she then called her employer and her fiance. Called as a witness by the State, the prosecutrix' fiance testified that he was awakened by the above call at approximately 3 a.m. During the conversation, the prosecutrix told him that she had been raped and he advised her to see a doctor.

After a short visit with some friends in the same building, the prosecutrix called the police who arrived shortly thereafter to take her statement. Later that morning she was examined by her personal physician who performed certain tests which indicated that she had recently engaged in sexual activity.

The prosecutrix further testified that three days after the rape she

received a telephone call from the defendant who wanted to see her that evening. The prosecutrix arranged to meet the defendant that evening at the corner of Clark and Division Streets. After she hung up from this call, she phoned the police and arrangements were made for two plainclothes policemen to be at that corner at the appointed hour.

That evening she drove her car to Division Street, followed by a second car containing her fiance and a friend. As she reached Clark and Division streets, the defendant pulled his car in behind hers and directed her to pull over to the curb. She became nervous and instead drove two more blocks to State and Division where she finally stopped. Although the defendant escaped, the prosecutrix' fiance wrote down his license number. The following evening detective Sam Greiner of the Chicago Police Department visited the prosecutrix and showed her a group of photos. From these photos she picked that of the defendant and identified it as a picture of the man who had robbed and raped her.

Testifying in his own behalf, defendant stated at trial that he first met the prosecutrix on March 8, 1974, 11 days prior to the incident. The defendant explained that he and a friend of his, Chester Dalton, stopped at a carry-out restaurant near the corner of Belmont and Broadway and that Dalton left to buy some food while he waited in his car. As he waited, the defendant noticed an attractive young blonde pull up to the curb directly in front of his car. He had a conversation with the woman and persuaded her to give him her name and phone number. The young woman, identified by Richardson at trial as the prosecutrix, told Richardson that she was leaving town, but would return late in the evening on March 18, 1974.

Richardson went on to testify that after he met the prosecutrix, he called a certain telephone number to obtain the prosecutrix' address and drove to that address at 12:15 a.m. on March 19, 1974. Twenty minutes later, the prosecutrix arrived in the parking lot. Richardson approached her and asked if he could talk to her for a while. The prosecutrix told him she was tired but agreed to stay out for a short while. He felt she was anxious to leave the area of her apartment building. She took her suitcase, placed in under a covered alcove, and entered Richardson's auto. Richardson denied taking any money from the prosecutrix at this time and also denied having any weapon.

Richardson drove to the front of the building where he double-parked to close the door on the passenger side of the car. Richardson felt that the prosecutrix was getting nervous and testified that she told him he should not park so close to her place. However, Richardson said that she did not attempt to leave his car at this or any other time.

Richardson testified that he drove around the north side and conversed with the prosecutrix. As they drove, she placed her arms around him,

kissed him, and he did the same with her. Finally, at about 1:45 a.m., he parked in an alley located near Grant Hospital. Once parked, Richardson said that the prosecutrix continued to kiss him, began rubbing his penis, and that they then engaged in an act of intercourse in the front seat of his automobile. After the prosecutrix left the car briefly to urinate, a second act of intercourse occurred. Richardson testified that the prosecutrix voluntarily engaged in sexual intercourse and that she complimented him on his physique.

The two resumed driving about the streets of Chicago, and at 3 a.m. Richardson dropped the prosecutrix off one half block from her apartment building. The prosecutrix told him she would see him soon.

Richardson further testified that he called the prosecutrix the following Friday to arrange a date for that evening. Over the telephone, the two agreed to meet at the corner of State and Division. At approximately 8 p.m. Friday evening the defendant noticed the prosecutrix' automobile near LaSalle and Division Streets. He pulled in behind her and after warning the prosecutrix about getting a ticket and asking her to follow his car, he parked on State Street. He was then approached by a squad car. A uniformed officer came up to him and asked him for some identification. After Richardson produced some identification, the policeman told Richardson they had a report that "you are a rapist." The defendant replied that the officer must be kidding, but the officer assured him otherwise. The policeman then asked Richardson if he had ever dated any white girls from the north side. After Richardson responded affirmatively, the officer replied, "Well, one of them is pissed off at you." With that, the officer returned Richardson's identification and left in his squad car. Richardson soon left as well. He later called home and was told he was being sought by the police concerning a hit and run accident. He later surrendered to the police on his own accord.

Also called as a witness for the defense was Chester Dalton, who was called to corroborate defendant's testimony concerning his initial encounter with the prosecutrix. Dalton testified that on March 8, 1974, he and the defendant played basketball and then went to a McDonald's restaurant around the corner of Belmont and Broadway. Dalton went to the McDonald's to purchase some hamburgers and as he returned to the car he saw Richardson speaking to a young, blonde, white girl who was driving a 1965 or '66 Mustang. Dalton was about 20 feet away from the two as they conversed. He stood watching this encounter for about five minutes before the girl drove away in her car, eastbound on Belmont. After she had left, the defendant told Dalton that the young lady was interested in "checking him out" after she returned from her vacation. The defendant also produced a slip of paper bearing a name and phone number which the girl had given him.

■■ Defendant first contends that the trial court improperly excluded Chester Dalton's identification of the prosecutrix. During trial, Dalton testified that the only thing he saw was that the woman who was talking to the defendant at the McDonald's was white and had blonde hair. There was nothing further that he remembered concerning the woman's build or appearance. When asked by defense counsel if he would be able to recognize this woman, Dalton responded that he did not know, but that he did know that she was white and blonde. The following colloquy then occurred between defense counsel and Dalton:

"DEFENSE COUNSEL: Did you see her the courtroom?

DALTON: The other day I took a peep at her when she was up on the stand.

DEFENSE COUNSEL: Did you recognize that girl as being the same girl in the vicinity?

DALTON: Her hair and stuff like that kind of look the same."

The trial court excluded the above testimony because it was based upon Dalton's having seen the prosecutrix through the court's glass doors as she was testifying and as Dalton was waiting in the corridor. The trial court reasoned that this was a violation of the exclusionary rule agreed upon by the parties prior to trial. In making the above ruling, the trial court also stated that Dalton's testimony with respect to the identification was not very conclusive. We see no need to consider the propriety of the trial court's ruling which excluded the above testimony. We believe the above testimony concerning Dalton's identification of the prosecutrix was of such an inconclusive nature that its exclusion from evidence was of no prejudice to the defendant. Dalton's supposed identification of the prosecutrix consisted of the inconclusive statement, "Her hair and stuff like that kind of look the same." This inconclusiveness is emphasized by Dalton's previous inability to describe the woman's build or appearance. He testified that he merely knew she was white and blonde. Considering the inconclusiveness of Dalton's testimony, we conclude that no prejudice resulted to the defendant due to the trial court's ruling excluding the testimony.

Defendant next contends that Chester Dalton was improperly impeached on collateral matters raised by the testimony of the rebuttal witness, Frank Stachyra. The defendant contends that Stachyra's testimony concerned trivial details such as whether the drive-in Dalton had mentioned was a McDonald's or a Burger King, whether or not it had a parking lot, whether the restaurant was located on Belmont or Broadway, whether the 1966 Mustang was brown or red, and whether the date was the 7th, 8th or 9th of March. The defendant contends that this line of questioning amounts to the impeachment of a witness on immaterial issues. Defendant also contends that the trial court erred in

allowing the State to impeach Dalton based upon testimony that had already been disallowed by the trial court. The defendant refers specifically in its brief to questions put to Dalton during cross-examination challenging Dalton's ability to distinguish facial features or hair color through the tinted glass doors of the courtroom.

■■ While we agree with the defendant that the above cross-examination was improper, we note that defendant did not object at trial to any of the above questions asked Dalton on cross-examination for the reasons now raised in his brief on appeal. We further note that defendant was convicted after a bench trial. When a case is tried without a jury, the trial judge is presumed to have considered only competent evidence in reaching his decision unless it affirmatively appears to the contrary in the record. (*People v. Glanton* (1975), 33 Ill. App. 3d 124, 338 N.E.2d 30.) After reviewing the record in the instant case, we find no place in the record where it affirmatively appears that the trial court considered the above improper impeachment in reaching its decision.

■■■ Defendant next contends that the State's failure to disclose the identity of Frank Stachyra, an assistant State's Attorney called by the State to rebut the testimony of Chester Dalton, was a violation of defendant's right to due process of law. Defendant acknowledges that Chester Dalton was not listed in its answer to the State's motion for discovery and that Mr. Stachyra did not interview Chester Dalton until July 18, the second day of trial. For that reason defendant readily admits that it was impossible for the State to list Mr. Stachyra as a witness in its answer to defendant's motion for discovery. However, defendant complains of the fact that it was not until July 24, six days after Mr. Stachyra interviewed Chester Dalton and when Mr. Stachyra was being sworn in as a witness, that the defense was put on notice that Mr. Stachyra would testify. Supreme Court Rule 415 (Ill. Rev. Stat. 1975, ch. 110A, par. 415(b)) places the State under a continuing obligation to disclose the names of witnesses. We believe that under Rule 415 the State had a duty to inform the defense of its decision to call Mr. Stachyra as a rebuttal witness as soon as such a decision was made. (*People v. Manley* (1974), 19 Ill. App. 3d 365, 311 N.E.2d 593.) In the instant case, when the defense had no notice of the State's intention to call Mr. Stachyra until he was actually being sworn in as a witness, the State clearly failed to comply with their duty to disclose. However, we fail to see how the defendant was prejudiced in any way by the State's conduct. After Mr. Stachyra was called by the State and before he testified, the trial court gave the defense the opportunity to interview the witness. During a lunch break, defense counsel interviewed Mr. Stachyra and answered "ready" when the trial resumed. After the assistant State's Attorney examined Mr. Stachyra, defense counsel cross-examined him. When Mr. Stachyra took the stand,

defense counsel did not ask for a continuance, not did he object based upon the fact that his interview with Mr. Stachyra during the lunch break was too short. Furthermore, defendant does not now claim that the cross-examination of Mr. Stachyra would .have been different had the State notified the defendant sooner. Under these circumstances, the defendant suffered no prejudice due to the State's failure to disclose Mr. Stachyra as a witness.

■■ ■ Defendant next contends that he was unfairly limited in presenting testimony to explain an apparent prior inconsistent statement. On cross-examination the assistant State's Attorney asked the defendant whether he had ever told anyone that he was not with the prosecutrix at the time of the incident. After the defendant responded that he was at work Tuesday night, March 19, the assistant State's Attorney read the following testimony of the defendant given at a preliminary hearing: "All I was fixing to say, I supposed to be at work tomorrow. At this time I supposed to committed this, I was at work then." When asked if he gave the answer at the preliminary hearing, Richardson responded: "That's correct. I was questioned about the 19th and I was at work on the 19th, which this was brought to me. That's definitely correct. Correct statement." On redirect, Richardson testified that he worked a full shift on March 19. Defense counsel then asked:

"So when you stated in court on March 27, 1974—you stated at this time—you said 'All I was fixing to say, I supposed to be at work tomorrow.' Were you referring to the date March 28?"

Richardson responded:

"Yes, I was referring to the 19th. I was trying to tell the Judge I was at work on the 19th which was the date * * *."

The State objected and the trial court struck the answer as not responsive. Defense counsel asked further questions in an attempt to have Richardson explain this answer and objections to these further questions were sustained. A witness should be afforded an opportunity to explain prior inconsistent statements and show the circumstances under which it was made. (*People v. Hicks* (1963), 28 Ill. 2d 457, 192 N.E.2d 891.) We believe the record shows that the trial court did afford the defendant the opportunity to rehabilitate himself. Defense counsel asked the defendant about his prior statement and the defendant clearly responded that he was at work the 19th. Further questions on this point were an attempt by defense counsel to testify for his client and objections to these questions were properly sustained by the trial court.

■■ Defendant finally contends that the trial court erred in entering judgment and imposing sentences on both the charge of rape and the charge of aggravated kidnapping. Defendant argues that he was punished twice for the same act.

Recently, in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, the

Illinois Supreme Court noted that there have existed dual standards, the "separate and distinct act" and the "independent motivation" tests, for determining when multiple convictions and concurrent sentences are permissible. Indicating that these dual standards have given rise to inconsistent results, the supreme court in *King* adopted the "separate and distinct act" standard and rejected the "independent motivation" standard for those cases in which concurrent sentences have been imposed. The Supreme Court in *King* affirmed convictions for rape and burglary and held:

"* * * that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." (66 Ill. 551, 566, 363 N.E.2d 838, 845.)

Applying the holding in *King* to the case at bar, we find that the instant offenses of rape and aggravated kidnapping arose from a series of closely related acts, are not lesser included offenses, and that thus both convictions should be affirmed. See also *People v. Carroll* (1977), 49 Ill. App. 3d 387, 364 N.E.2d 408.

For the foregoing reasons, the convictions for armed robbery, rape and aggravated kidnapping are affirmed.

Judgments affirmed.

GOLDBERG, P. J., and O'CONNOR, J., concur.