THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
KARL STEIN, Defendant-Appellant.

First District (1st Division)   No. 61323

Opinion filed August 1, 1977.

James J. Doherty, Public Defender, of Chicago (Timothy P. O'Neill and John T. Moran, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Mary Ellen Dienes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

After a jury trial, the defendant was found guilty of rape, aggravated kidnapping, and indecent liberties with a child. The jury acquitted the defendant of an additional charge of deviate sexual assault. The trial court entered judgment on the rape and aggravated kidnapping verdicts and sentenced the defendant to concurrent terms of 6 to 18 years.

From these judgments defendant now appeals and contends as follows: (1) that he was not proved guilty beyond a reasonable doubt; (2) that he did not receive adequate assistance of counsel; (3) that the prosecution's closing argument denied him a fair trial; (4) that the trial court erred in failing to instruct the jury to disregard the prosecutor's questions referring to a pretrial motion to suppress identification; (5) that there was no evidence presented showing that the alleged intercourse was by force and against complainant's will; (6) that the trial court erred in denying his motion to suppress certain evidence recovered from a garbage can in his backyard; and (7) that the conviction and sentence for aggravated kidnapping be reversed because the aggravated kidnapping arose out of a single course of conduct, the sole goal of which was sexual intercourse.

We affirm.

The complaining witness, 11 years old at the time of the incident, testified at trial that at approximately noon on June 10, 1973, as she was leaving a McDonald's restaurant, a man (whom the complainant identified at trial as the defendant Karl Stein) came up and winked at her. She left the restaurant on her bicycle and the man followed her in his auto. After pedalling down an alley, the complainant came to an intersection where the man who had winked at her was blocking her way with his car. He told her he would give her $5 if she would "do a job." When the complainant replied that she had to get home, the man told her to get into the alley. The complainant did as she was told. The man drove his car into the alley, pulled the complainant inside the car, and locked the car door. He pulled down his pants, got on top of the complainant, and after a few seconds stated, "This won't do." The man pulled up his pants and drove out of the alley with the complainant. Eventually, the car pulled into another alley and up to a garage. The complainant and defendant exited the car, walked through a backyard and up to the side entrance of a house. The defendant left the complainant a moment as he walked to the front of the house. The defendant returned immediately, took a key from his pocket and opened the side door. They both entered the house and went downstairs into a room in the basement. The defendant took off his clothes, told the complainant to do the same, and instructed her to get into bed. At this point, the defendant attempted to insert his penis in the complainant's vagina.

The defendant then removed a blue leather box from a dresser drawer.

From the box defendant removed some tissue, a jar of Vicks, and a stick 8 or 9 inches long, one-half inch in diameter and shaped like the end of a broom handle. After coating the stick with Vicks, the defendant inserted it into the complainant's vagina for two to five minutes. At this time the complainant was screaming. The defendant removed the stick and then had intercourse with the complainant. The defendant then ordered the complainant to perform an act of fellatio. Frightened, the complainant refused. After the defendant told her he would kill her if she did not, she performed the act of fellatio. The defendant fondled the complainant's breast and vagina and again had intercourse with her. After instructing the complainant to dress, the defendant went upstairs. When he returned, he put on a yellow short-sleeved shirt, put the stick, the Vicks, and the tissues back in the blue box. He then left with the complainant. As they walked through the backyard, the defendant threw the blue box into a garbage can near the gate. The defendant then drove the complainant back to the alley where she had left her bicycle. Several times during this trip the defendant threatened to kill the complainant if she told anyone what had occurred.

The complainant went on to testify that after the defendant dropped her off in the alley, she rode her bicycle home. She told her parents she had been raped and her father called the police.

A uniformed officer arrived at the house, questioned the complainant, and took her to a hospital where she was examined by a doctor.

The doctor who examined the complainant testified at trial that there was a bruise on one of her breasts and swelling at the entrance to her vagina. He performed tests which indicated that the complainant had recently had intercourse. Also called as a witness by the prosecution was the complainant's mother who testified that when her daughter arrived home she was upset and crying and stated that she had been raped.

The complainant further testified at trial that she spoke to three plainclothes policemen. After a conversation with the officers, the complainant, her father and three officers attempted to locate the defendant's house. They drove for approximately one-half hour before the police car drove down an alley. The complainant told the police that she saw the house. She knew that was the house because she recognized a garbage can, a picnic table with an animal skin tablecloth, a glass of water, benches and pepsi bottles in the backyard. They entered the yard and 10 minutes later she saw the defendant and told one of the officers "that was the guy who did it." The defendant was then handcuffed and taken away.

The complainant also testified that the above acts occurred between noon and 1 p.m.; that she did not give the defendant permission to put his penis in her vagina or her mouth or to fondle her; and that the defendant

had a tattoo that looked like a fancy "T" on his left arm and a cut above his upper lip. She further testified that the defendant was wearing light blue pants and a light blue "net shirt." She also described defendant's car as a brown two-door with a black roof. The complainant testified that defendant's auto had several speakers and clothing in the back seat at the time of the incident.

Also called as a witness by the State was Investigator Shanahan of the Chicago Police Department who testified that he spoke to the complainant at the hospital and later accompanied her in an unmarked squad car in an attempt to locate her assailant's home. Prior to reaching the house, the complainant described to Investigator Shanahan the house, its physical surroundings, the assailant, and his car. As the police car was proceeding down an alley behind the defendant's parents' home, Shanahan observed a redwood picnic table with an animal print cover and a small glass of water which the complainant had previously described. When the defendant later arrived at the scene, Officer Shanahan arrested him and discovered keys to the house in defendant's pocket.

After receiving the defendant's permission to enter the house, Investigator Shanahan entered the house along with four other officers looking for other items in the house which the complainant had described to him. Inside the house Officer Shanahan saw an automobile tire resting on the basement landing, a large poster at the bottom of the stairs, and a door with the name Karl Stein Junior affixed thereto. Officer Shanahan passed through this door and noticed a poster with a picture of smiling lips and teeth. Later Officer Shanahan observed the automobile that defendant drove to the house. He described this car as a 1968 Buick two-door, with two radio speakers and clothing in the back seat.

Officer Shanahan further testified that he discovered a blue box in a garbage can in defendant's backyard. He opened the box with a pen and saw a stick, tissue paper, a ruler and a jar of Vicks inside. Officer Shanahan also spoke to the defendant's girl friend Mary Ann Boivin at the scene, went to her house, and recovered a blue shirt from underneath her bed. This blue shirt was the same blue shirt that the complainant had earlier identified as the one worn by her assailant.

Police officer Thomas Walsh, called by the State, testified that he was an evidence technician and had examined the contents of the blue box found in the garbage can behind defendant's house. The items were covered with an oily, greasy substance. He dusted the box and its contents for fingerprints and found none. Officer Walsh explained that a surface has to be smooth and clean in order for a fingerprint to be lifted from it.

Investigator John Leonard, also called by the State, testified that he had a conversation with the defendant's girl friend in the alley in back of

defendant's house. After this conversation, Investigator Leonard accompanied Miss Boivin back to her house where she gave Investigator Leonard a pair of blue pants belonging to the defendant. The complainant had previously testified that those trousers were the ones worn by her assailant.

Also called by the State was Police Investigator Cindy Pontoriero who testified that she accompanied the complainant, her father, and police officers Cagney and Shanahan in an attempt to locate defendant's house. They stopped at a house located at 4505 North Lawndale. While standing in the backyard with the complainant, Officer Pontoriero saw a man walking toward the gangway of the house. The complainant spoke first saying, "That's him, that's him." Officer Pontoriero asked the complainant if she was sure and the complainant replied, "Yes, I am."

The defense consisted of defendant's testimony and that of alibi witnesses called in his behalf. The defendant testified that he and two friends, David Floyd and Steve Rowan, arrived at Miss Boivin's house at approximately 11:45 a.m. the day of the incident. Ten minutes later, they left, bought some beer, and drove around for approximately half an hour. They then parked behind the Jefferson Ice House on Montrose and Pulaski where they drank some beer and smoked some cigarettes. The defendant, Floyd and Rowan then returned to Miss Boivin's house at approximately 1 p.m. The defendant went inside and his friends waited outside. Ten minutes later, David Floyd drove the defendant to the defendant's house. The above testimony was corroborated by David Floyd and Steve Rowan.

The defendant further testified that on June 10, 1973, he was 6'4" tall and 18 years old; he had a tattoo on his arm and a 1968 brown Buick with a black vinyl roof; did not have a cut above his lip, but did have hair above his upper lip. Defendant also explained that on the day of the crime he had clothes in the back seat of his car because he had packed his belongings and moved out of his parents' house with the help of his friends.

Also called by the defense were Miss Boivin, her mother, and her aunt. They testified that a little before noon on June 10, 1973 the defendant and two of his friends arrived to visit Miss Boivin; that they left at approximately noon; and that the defendant returned alone to see Miss Boivin at approximately one o'clock.

On cross-examination Miss Boivin further stated that the defendant left her house with his two friends at 11:45 a.m. the day of the rape. However, this testimony was impeached by testimony Miss Boivin had given at a preliminary hearing, and she later on admitted she knew that the defendant and his friends were going separate ways when they left her house at 11:45 a.m.

The defense also called Officer Steven Potopa to testify. Later the trial court ruled that Officer Potopa was a witness for the People. Officer Potopa testified that he was the first witness to respond to the call from the complainant's parents; that he went to the complainant's house; and that he questioned the complainant but was not able to talk to her very much because she was crying and upset. Officer Potopa prepared a written report. Referring to his notes Officer Potopa described the offender as a "male white," "five feet, eight," "slim build," "approximately 22," "brown curly hair, worn short," "has cut under his nose," "wore yellow short sleeve shirt," "pants were light blue with large cuffs," and "said his name was Mike." There was no mention of a tattoo. Under "offender's vehicle," the report described it as "brown," "4-door," "make unknown," "style unknown," and "state license number unknown."

Defendant first contends that he was not proved guilty beyond a reasonable doubt because the complainant's testimony is replete with inconsistencies and improbabilities. After reviewing the complainant's testimony and the record as a whole, we must reject this contention. We find the complainant's testimony to be clear and convincing and further find this testimony to be corroborated. The complainant was with her assailant for over an hour and had an excellent opportunity to view him. Her description of the defendant's parents' house and yard was detailed and accurate. Defendant suggests that this description should be given little weight because the police gave her a "guided tour" of the premises after the incident occurred. We disagree. Officer Shanahan's testimony indicates that the complainant had described the picnic table, the animal print cover, and the glass of water to him before they returned to the Stein home. Officer Shanahan further testified that when he went into the home he was looking for items that the victim had described to him.

Furthermore, the complainant's identification of the defendant shortly after the incident was spontaneous and positive. Her description to the police of the blue box and its contents, and its location in the garbage can behind the house were later corroborated by the police when they found the box and contents in the garbage can behind the Stein home. Although defendant presented witnesses in an attempt to establish an alibi defense and Floyd and Rowan testified that they were drinking with the defendant during the time of the rape, another defense witness, Mary Ann Boivin, changed her testimony during trial and admitted that when the defendant left her house with Floyd and Rowan shortly before noon the day of the occurrence, she knew they were going their separate ways.

As stated in *People v. Brown* (1975), 32 Ill. App. 3d 182, 187, 336 N.E.2d 523, 527:

> "It is well settled that clear and convincing testimony of the victim standing alone is sufficient to support a conviction for rape even

without corroboration. (*People v. Nichols* (1974), 17 Ill. App. 3d 871.) Clear and convincing evidence, however, is not synonymous with uncontradicted or unimpeached testimony. Minor variances in the testimony may occur, and if so, these variances constitute mere discrepancies going only to credibility. (*People v. Wright* (1972), 3 Ill. App. 3d 829.) It is the task of the trier of fact, here the court, to weigh these discrepancies. If it is found the discrepancies are so minor as not to detract from the reasonableness of the victim's story as a whole, her testimony may be found to be clear and convincing. (*People v. Brown* (1963), 29 Ill. 2d 375.)* * *"

■■ Although there may be discrepancies in the complainant's testimony, after reviewing the record as a whole we view these to be of a minor character. We also consider her testimony to be clear and convincing and corroborated in significant regard. We find no reasonable doubt of defendant's guilt.

Defendant next contends that he received ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights because his attorney failed to vigorously and competently cross-examine the complaining witness. In *People v. Ortiz* (1974), 22 Ill. App. 3d 788, 795, 317 N.E.2d 763, 768, we summarized, as follows, the standard to be used in testing a claim of ineffective assistance of counsel:

"To test a claim of ineffective assistance of counsel in Illinois, where the trial attorney was of defendant's own choosing, defendant must prove that the caliber of representation was so low as to reduce the trial to a farce or a sham (*People v.Washington* (1968), 41 Ill. 2d 16, 241 N.E.2d 425), or as to constitute no representation at all (*People v. De Simone* (1956), 9 Ill. 2d 522, 138 N.E.2d 556), or as to deprive the defendant of the chance of being found not guilty of the charge. (*People v. McCoy* (1967), 80 Ill. App. 2d 257, 225 N.E.2d 123.) It is not enough to sustain the charge by demonstrating that the representation was merely poor (*People v. Hicks* (1935), 362 Ill. 238, 199 N.E. 368) or by showing that counsel's trial tactics were unsuccessful. *People v. Gill* (1973), 54 Ill. 2d 357, 297 N.E.2d 135."

A conviction will be reversed where it is shown that the legal representation caused such substantial prejudice to the defendant as to deny him fundamental fairness. *People v. Ortiz.*

■■ Defendant cites nine specific instances in the record which he argues are inconsistencies and discrepancies in the complainant's testimony which defense counsel failed to explore during cross-examination. We see no need to consider each of these instances in detail. Suffice it to say, we have considered each of these instances and find that

some of them were raised during defense counsel's closing argument. The others, assuming they are indeed inconsistencies, are of such a minor character that defense counsel's failure to pursue them certainly did not reduce the trial to a farce or sham, constitute no representation at all, or deprive the defendant of the opportunity of being acquitted of the charges against him. Furthermore, it is entirely possible that defense counsel failed to explore these alleged inconsistencies in complainant's testimony because they were minor in character and, considering the tender age of the complainant, did not want to antagonize the jury. Such a decision is a matter of trial tactics to which a review of counsel's competency does not extend. *People v. Baer* (1976), 35 Ill. App. 3d 391, 342 N.E.2d 177.

Defendant next contends that certain comments by the prosecution during closing argument denied him a fair trial. Defendant objects first to references to him as an "animal" and "pervert." Defendant also objects to the following characterization of the testimony of defense witnesses, Steve Rowan and David Floyd:

> "The things they testified too [*sic*] could possibly have happened, particularly like helping the crowd on drugs and all, you have to extend it a little bit."

Although David Floyd and Steve Rowan did testify that they were drinking beer and smoking cigarettes with the defendant, they did not mention the use of any drugs.

■■■ We first note that none of the allegedly improper comments were objected to at trial and as such the defendant has waived his right to urge this point on appeal. (*People v. Hayes* (1975), 35 Ill. App. 3d 61, 340 N.E.2d 593.) Also, considering the conduct of the defendant in its totality, we believe that references to defendant's conduct were fair inferences to draw from the evidence presented at trial. (See *People v. Welton* (1968), 96 Ill. App. 2d 167, 238 N.E.2d 141; *People v. Oparka* (1967), 85 Ill. App. 2d 33, 228 N.E.2d 291.) Furthermore, although we believe that the reference to drugs was improper, it was fleeting and not so harsh or prejudicial as to prejudice the defendant or require a reversal of defendant's conviction.

■■ The defendant next contends that the trial court erred in failing to instruct the jury to disregard the prosecutor's questions referring to a pretrial motion to suppress identification. Shortly after the jury was sworn in, the trial judge in chambers advised both the prosecutor and the defense that no reference was to be made to a lineup identification which the trial judge had ruled suppressed. Three days later, during the direct examination of a prosecution witness, the following occurred:

> "ASSISTANT STATE'S ATTORNEY: Also at the preliminary—

excuse me, not a preliminary hearing but in particular it was a motion to suppress identification. Again on the same date at the time you testified that being June—

DEFENSE COUNSEL: I object and make a motion for mistrial.

ASSISTANT STATE'S ATTORNEY: May I finish?

THE COURT: Yes, you may finish, you may finish.

ASSISTANT STATE'S ATTORNEY: Directing your attention to the same date, June 27th, 1974, when you testified at the motion to suppress, did you make the following answer to the following questions?"

After a conference in chambers concerning the above motion for a mistrial, the trial judge made a specific finding that the prosecutor's reference to the motion to suppress was inadvertent, and denied the motion for mistrial.

Defendant argues that the word "suppress" has sinister overtones and that "suppression of identification" could well have been interpreted to mean that the defense made some attempt to prevent the complainant from testifying. The defendant further argues that the fact that the complainant did testify might suggest that a judge earlier had approved of her testimony in some way.

In support of this proposition defendant cites *People v. Bates* (1975), 26 Ill. App. 3d 306, 325 N.E.2d 123. In *Bates* this court reversed defendant's conviction and remanded for a new trial because the prosecution stated in the presence of the jury that the trial court had ruled that the lineup was fair and had denied a pretrial motion to suppress the lineup. The defendant claims the prosecution's comments in the instant case were far more insidious than those in *Bates*. We disagree.

Clearly, the prosecution's reference to the instant motion to suppress was improper. However, this reference was a passing reference which the trial court specifically found to be inadvertent. The *Bates* case is inapposite to the instant situation. In *Bates* the prosecution specifically stated to what the motion to suppress referred and specifically told the jury that the court had denied defendant's motion to suppress. The reference to the motion to suppress in *Bates* was not inadvertent and was more than a passing one. We believe the instant situation more closely resembles that presented in *People v. Smith* (1976), 39 Ill. App. 3d 732, 350 N.E.2d 791. In *Smith*, the prosecutor, during the cross-examination of the defendant, referred to a question asked defendant during a hearing on a "motion to suppress evidence." On appeal, Smith contended that the reference to the motion to suppress might cause the jury to speculate that certain evidence unfavorable to defendant was being withheld from them. Noting that the reference was a passing one and apparently inadvertent, this court in *Bates* stated that, although an instruction to the

jury to disregard the reference might have been useful, such an instruction was unnecessary given the minimal possibilities of prejudice from such a reference. We similarly believe that in the instant case, if the jury even noticed the reference, they could not have attached great significance to it. As a result an instruction to disregard the reference was not necessary.

■■ The defendant further contends that the rape conviction must be reversed because there is no evidence tending to show that the sexual intercourse occurred "by force and against her will." In order to prove the charge of forcible rape there must be sufficient evidence to demonstrate that the act was committed by force and against the will of the female. (*People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 651.) The degree of force exerted by the defendant and the amount of resistance on the part of the complaining witness are matters that depend upon the facts of the particular case. (*People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865; *People v. Montgomery* (1974), 19 Ill. App. 3d 206, 311 N.E.2d 361.) However, useless and foolhardy resistance is not required of a rape victim in order to establish that the sexual intercourse was against her will. (*People v. Brown* (1976), 41 Ill. App. 3d 641, 354 N.E.2d 602.) It is our decision that the testimony of the complaining witness was sufficient to establish that the act of sexual intercourse occurred by force and against her will. There is no dispute that the complaining witness testified at trial that she did not give the defendant consent to engage in sexual acts with her. The complainant further testified that she "couldn't do anything" when the defendant was engaging in sexual intercourse with her in the bedroom. She also testified that at one point during the sexual activity in the defendant's bedroom, she was screaming and that at another point he threatened to kill her if she did not cooperate with him. The complainant was 11 years old and her assailant over 6 feet tall at the time of the attack, additional factors which denote that resistance would have been futile. Further, the complainant testified that the nightmare of events began when the defendant grabbed her by her arm and forcibly pulled her into his automobile. Finally, complainant's mother testified that complainant was crying, shaking and gagging when she came home and immediately stated that she had been raped. Such facts of record are sufficient to demonstrate that the acts were committed by force and against the will of the complainant.

■■ Defendant next contends that the trial court erred in denying his motion to suppress a blue box, a stick, tissue paper and a jar of Vicks recovered by the police from a garbage can in the backyard of the Stein residence. The garbage can was adjacent to an alley and separated from that alley by only a cyclone fence 5 to 6 feet high. The seized items were found on the top of grass clippings in an open garbage can one-half to

two-thirds full. Recently the Third District in *People v. Huddleston* (1976), 38 Ill. App. 3d 277, 347 N.E.2d 76, ruled that the defendant lacks standing to contest the search of trash bags by the street in front of the defendant's home awaiting pickup by the trash collector. The court ruled that "[a] person who abandons property no longer has a 'reasonable expectation' of freedom from governmental intrusion into the area, or from governmental appropriation of the abandoned property." (38 Ill. App. 3d 277, 279, 347 N.E.2d 76, 79.) Defendant, however, contends that the instant situation is different from that in *Huddleston*. Defendant points out that in Huddleston the court stated that "the location of the trash is a significant factor in determining whether defendant has abandoned the trash or whether defendant has a 'reasonable expectation of privacy,' * * *." (38 Ill. App. 3d 277, 281, 347 N.E.2d 76, 80.) Defendant then points out that the trash in *Huddleston* was placed on the shoulder of the road in front of the house waiting to be picked up and that the trash in the instant case was in defendant's backyard. Whether this case is distinguishable from *Huddleston* we need not decide. The thrust of the Fourth Amendment is stated as follows in *Katz v. United States* (1967), 389 U.S. 347, 351, 19 L. Ed. 2d 576, 582, 88 S. Ct. 507:

> "[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [Citations.]"

Thus, if items are seized from a place where a defendant has a reasonable expectation of privacy such items will be protected. In the instant case, the seized articles were placed on top of a trash can, next to an alley and separated therefrom by only a cyclone fence. The can was one-half to two-thirds full and the lid was not on the can. The articles could easily have been seen by anyone passing by in the alley. To say that defendant sought to preserve these articles as private stretches credulity. The articles were knowingly exposed to the public and as such are not subject to Fourth Amendment protection. For this reason the trial court did not err in denying the motion to suppress.

The defendant finally contends that the jury's verdict does not support separate convictions and sentences for rape and aggravated kidnapping because the aggravated kidnapping arose out of a single course of conduct, the sole objective of which was sexual intercourse. This identical contention was raised in two cases recently decided in this court. See *People v. Carroll* (1977), 49 Ill. App. 3d 387, 364 N.E.2d 408; *People v. Richardson* (1977) 50 Ill. App. 3d 550, 365 N.E.2d 603. In both *Carroll* and

*Richardson* we cited the holding by the Illinois Supreme Court in *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 845:

> "* * * that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered"

and rejected the above contention.

In the instant case concurrent sentences were imposed for the offenses of rape and aggravated kidnapping. Both offenses arose from a series of closely related acts, and are not lesser included offenses.

For the above reasons the convictions of the circuit court of Cook County are affirmed.

Judgments affirmed.

O'CONNOR and BUA, JJ., concur.