THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LEONARD DOWNEY, Defendant-Appellant.

First District (4th Division)    No. 62437

Opinion filed September 22, 1977.

James Geis and Victoria J. Meyers, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, James S. Veldman, and James B. Davidson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

Defendant, Leonard Downey, was indicted for the offenses of armed robbery, deviate sexual assault, rape and two counts of aggravated battery. (Ill. Rev. Stat. 1971, ch. 38, pars. 18—2, 11—3, 12—4, 12—4(b).) Following a bench trial in the circuit court of Cook County, defendant was found guilty on all charges and was sentenced to concurrent terms of 4 to 30 years for armed robbery, 4 to 30 years for deviate sexual assault, 4 to 30 years for rape and 4 to 10 years for aggravated battery. On appeal, defendant seeks reversal of the convictions and a new trial contending the trial court improperly admitted prejudicial comments by one of the State's expert witnesses. Defendant further urges that the trial court erred in entering judgment and sentencing him for the crime of aggravated battery since the offense arose out of the same course of conduct as the rape.

We affirm the trial court.

### THE STATE'S CASE

At trial, the State's witness, Mrs. Linda Wells Olinger (Wells) testified that at approximately 4 a.m. on September 2, 1972, she was sleeping in a bedroom of her cottage when she was suddenly awakened. She saw the shadow of a man coming toward her. As she sat up, the man stepped behind her, put his hand over her mouth, placed a gun to her head and stated, "Scream and I will kill you." As she got out of bed she felt a knife and gun in the man's pocket. The man asked her if she had any money. She said she did and at the same time, she moved to the base of her bed and stood up. The man kept his hand around her neck and then moved in front of her. Since there was very little light in the bedroom, all she could observe was the shadow of the man, who appeared to have curly hair. While the man kept his hand around her neck, she took $50 out of a dresser in her bedroom and obtained an additional $4 from her wallet in the kitchen.

Wells further stated that the man then led her to the unlit living room and forced her to perform and to submit to two acts of oral sex with him. He then forced her to have intercourse with him. During this time, the man kept her from facing him directly. During the act of intercourse, she

reached beside her and felt a knife on the floor. She had not left a knife there previously. Wells picked up the knife and began stabbing her assailant who then grabbed the knife away from her. Thereupon she discovered a gun on the floor. She picked up the gun, pointed it at the man and pulled the trigger but the gun did not fire. The man grabbed the gun away and forcibly yanked out a patch of her hair. He then dragged her to the front of the house and while she lay face down on the floor he placed a throw rug over her head. The man then stated, "Don't pull a stunt like that again." He then turned on the living room lights for a moment. At that point her position on the floor prevented her from seeing the man. Just before he left, she heard the man say, "Wait ten minutes—I have to go to Harvey." Upon hearing that statement, Wells recognized the man's voice as belonging to "Lonnie," a man she had seen and heard speak a number of times while in the presence of mutual friends. At the trial, she identified her assailant as defendant, Leonard Downey.

Wells further stated that after defendant left, she got dressed and ran to a nearby restaurant exclaiming to the people there that she had been raped. The police were called and after they arrived they took her to the hospital and later to the police station. At the hospital, she was examined and treated for cuts on her legs. She was then taken to a room in the hospital, where she identified the defendant as the man who had assailed and raped her.

Jacqueline Beechy, a waitress at the nearby restaurant where Wells fled after the incident, testified that Wells ran into the diner holding a pair of scissors and screamed "I have been raped. He has got a gun." Beechy noted that Wells was scratched about her eye and was bleeding from her ears. Wells' legs were also bleeding from small deep puncture wounds. Beechy then called the police.

Police officers Carol Cummings, Joseph Flaherty, Arthur Wolff and Leonard Zielinski testified as to the events subsequent to Beechy's telephone call. When the police arrived at the diner, they spoke to Wells and then drove her to the hospital for medical treatment. Wells was bleeding from her ears, legs and scalp. At the hospital, a doctor sutured Wells' leg wounds and performed tests that confirmed the presence of sperm in her vagina.

The police then proceeded to the neighborhood where defendant lived and located his apartment. They noticed a trail of blood leading up to defendant's apartment door. They knocked, and defendant opened the door approximately 6 inches, keeping the security chain fastened. The officers saw blood on defendant's chest beneath his unbuttoned shirt. Defendant asked the police for a search warrant and repeatedly refused to talk to the officers. When defendant walked away from the door, the

officers observed that the back of defendant's shirt was saturated with blood. The officers thereupon forced open the door and arrested defendant.

Shortly after the arrest, the police drove defendant to the hospital for medical treatment. During the drive to the hospital, defendant repeatedly asked the police about the security of his apartment.

When asked at the hospital how he had incurred his wounds, defendant replied, "It's for me to know and you to find out." Defendant refused medical treatment. At the emergency room, Wells identified defendant as her assailant. Shortly thereafter defendant telephoned his attorney.

Pursuant to a post-arrest investigation, the police examined Wells' residence and defendant's automobile and apartment as well as an adjoining parking lot where defendant's car was parked. This investigation produced the various weapons mentioned in Wells' testimony, as well as a few articles of bloodied and torn clothing including a man's T-shirt found lying on a hedge near defendant's car.

## DEFENDANT'S CASE

At trial, defendant testified on his own behalf but only had a limited recollection of the events. Defendant recalled that after he and four others had been drinking in a tavern, they plotted to kill Wells. One of the others gave defendant two pills and an injection. Defendant then went to his apartment, took a gun and broke into Wells' apartment. While he committed deviate sexual acts upon Wells, one of the co-conspirators watched him and then hit him on the head with a gun. Defendant remembered fleeing after being stabbed. He also recalled disposing of his pistol and T-shirt.

Defendant relied on the defense of insanity. Defendant, his sister, and five experts in the fields of neurology, psychiatry and psychology testified to the effect that defendant was insane at the time the crimes were committed.

Defendant and his sister, Janelle Kempae, testified as to defendant's emotional and family background. Defendant's stepfather was effeminate and a heavy drinker, and neglected defendant. Furthermore, defendant's father on one occasion forced Kempae and her younger brother, when they were young children, to have sexual intercourse. Defendant refused to participate when his father asked him to do so. The father also performed deviate sexual acts with Kampae, defendant, and their other brothers. In addition, defendant's mother on a number of occasions beat him with a rubber hose.

Defendant and his sister also testified that defendant was emotionally upset just prior to and after the breakup of his nine-year marriage, and at that time, defendant contemplated suicide. Defendant was deeply concerned about the safety of his young daughter, after he learned that

his father-in-law had been molesting his nieces. Defendant also mentioned that he was in two automobile accidents and that the injuries he sustained caused him to suffer headaches and dizziness.

The expert witnesses testifying on behalf of defendant were Dr. Wasserman, a neurologist, Drs. Ziporyn and Shlensky, psychiatrists, and Drs. Cheatham and Arbit, clinical psychologists.

Dr. Wasserman stated that the EEG taken of defendant indicated an abnormal, electrical discharge in the area of the brain which controls a person's emotional makeup, memory, intellect and personality. Dr. Ziporyn concluded that defendant suffered from a nonpsychotic, organic brain syndrome associated with physical injury to the brain and this was confirmed by the EEG. The physical injury would not affect defendant's day-to-day behavior, but could cause erratic and unstable behavior. In addition, persons suffering from this type of injury were especially susceptible to chemicals, including alcohol. Combining defendant's personality type (dependent with a depressive core), the organic damage and the stress induced by alcohol, defendant was less able than usual to control his impulses on the evening of the attack on Wells. After being asked a hypothetical question which combined facts from defendant's personal history and the incident in question, Ziporyn concluded that the person in the hypothetical suffered from a mental defect and was aware of the criminality of his actions, but could not control his behavior at the time.

Dr. Cheatham and Dr. Shlensky corroborated that defendant suffered from organic brain damage. Dr. Shlensky added that defendant had a poorly integrated prepsychotic personality that would tend to disintegrate under stress. As had been pointed out by Dr. Ziporyn, this personality combined with the organic brain damage made defendant extremely susceptible to drugs. Approximately two weeks before trial and upon the request of defendant's attorney, Dr. Shlensky had administered sodium amytrol, a barbituate, to defendant. This caused defendant to enter into a psychotic state. Dr. Shlensky was then asked the hypothetical posed earlier to Dr. Ziporyn. Dr. Shlensky agreed that the person in the hypothetical suffered from a mental defect which resulted in an impairment in his capacity to conform his conduct to that required by law. In addition, Dr. Shlensky believed that defendant would have also lacked the capacity to appreciate the criminality of his conduct. Dr. Arbit's opinion was substantially similar to Dr. Shlensky's.

STATE'S CASE IN REBUTTAL

The State offered the testimony of four experts and one lay witness to prove that defendant was sane during the time he committed the crime. The experts were Dr. Reifman, a psychiatrist, Dr. Gibbs, a professor of

neurology, Dr. Wepman, a professor of psychology and Dr. Katz, a psychiatrist. These experts were of the opinion that at the time of the attack on Wells on September 2, 1972, defendant could appreciate the criminality of his act and could conform his behavior to the requirements of law.

Dr. Reifman concluded, after interviews with defendant, that defendant had a passive aggressive personality. However, this type of personality disorder was not a mental disease or defect. Further, Dr. Reifman could not conclude, as all the defense experts had, that defendant suffered from organic brain damage.

Dr. Gibbs, a professor of neurology testified that his analysis of defendant's EEG revealed some abnormal electrical discharges. However, these were not of the type of abnormalities that could be linked with a mental disease or defect. During the State's redirect examination of Dr. Gibbs, the following colloquy took place regarding Dr. Gibbs' opinion of the defense expert, Dr. Wasserman:

"Q Doctor, are you familiar with a man by the name of Doctor Wasserman?

A I am.

Q. Have you ever had any dealings with Doctor Wasserman?

A I have.

Q What is the nature of his dealings with you?

A He tried to study with me.

Q Did he?

A I found him an unsatisfactory student. He did not come around often and just wasn't what I would characterize as a satisfactory student."

The State utilized these comments in closing argument to indicate that Dr. Wasserman's testimony regarding the EEG was not credible. Defendant did not object to Dr. Gibb's testimony or the State's closing remarks.

Dr. Katz, a psychiatrist and Dr. Wepman, a professor of psychology, substantially corroborated the testimony of the State's medical witnesses.

The State also called Cathy Barron, a lay witness, to prove that defendant was sane during the incident. Barron kept company with defendant from October 1970 through May 1973. They had a three-year-old child. Having observed defendant on several occasions between August and October of 1972, Barron was of the opinion that defendant was sane during that time.

After considering the evidence, the trial court concluded that defendant's conduct indicated "a tremendous amount of premeditation" demonstrating that defendant was "well in touch with reality." The trial judge rejected the insanity defense and found defendant guilty on all counts.

Opinion

We first consider whether the trial court improperly admitted, as rebuttal testimony, the comments of Dr. Gibbs that Dr. Wasserman was an "unsatisfactory student." Defendant urges that the admission of this testimony and the reference to it by the State in closing arguments was highly prejudicial and constitutes reversible error under the facts of this case.

■■■ As stated by our court in *People v. Burnett* (1975), 35 Ill. App. 3d 109, 119, 341 N.E.2d 86, 93:

"Rebuttal witnesses may properly be called by the State to contradict testimony elicited by the defense, but only with respect to material issues in the case. (*People v. McGhee*, 20 Ill. App. 3d 915, 314 N.E.2d 313.) Collateral matters which are not the proper subject for comment by rebuttal witnesses are generally considered to include facts which are irrelevant to the substantive issues in the case and facts which are not independently provable by extrinsic evidence, apart from impeachment purposes. *People v. McGhee.*"

■■ We believe that the statement of Dr. Gibbs went to a material and not a collateral issue in this case. Elicitation of remarks impugning the competency of Dr. Wasserman as a student was intended to cast doubt upon the credibility to be given to his expert testimony. The expertise of the defendant's neurologist was not a collateral matter, but rather went to the substantive issue of the diagnosis of defendant. Dr. Gibbs' opinion of Dr. Wasserman was thus a proper subject for rebuttal testimony. See VII Wigmore on Evidence 1940, §1984 (3d ed. 1940).

■■ We do, however, dispute the relevancy of the remarks made by Dr. Gibbs due to their dubious bearing on the actual competency and skills of Dr. Wasserman. Dr. Gibbs shed no light on Dr. Wasserman's expertise when he stated that to him, Dr. Wasserman was an "unsatisfactory student" because "he did not come around often." Furthermore, no foundation was laid regarding the specific context in which Dr. Gibbs knew Dr. Wasserman. Nevertheless, it was incumbent upon defendant to object at trial on either of these grounds. Given the insubstantial nature of the claimed error, we see no reason to relax the ordinary rule attributing a waiver to defendant. *People v. Burnett* (1975), 35 Ill. App. 3d 109, 341 N.E.2d 86; see *People v. Brantley* (1976), 43 Ill. App. 3d 616, 357 N.E.2d 105; Ill. Rev. Stat. 1975, ch. 110A, par. 615(a).

■■■ Also, regardless of defendant's failure to object, we note that the proceeding below was a bench trial. We must presume that the trial judge considered only the relevant evidence presented to him and discounted the comments made by Dr. Gibbs. (See *People v. Harris* (1974), 57 Ill. 2d 228, 314 N.E.2d 465.) There is no indication in the record that Dr. Gibbs'

remarks prejudiced the trial judge. Rather, the judge chose to believe the abundance of evidence which pointed to a person who was acting in a deliberate and premeditated fashion. We agree that the evidence adduced at this lengthy trial proved beyond a reasonable doubt that defendant was not suffering from a mental disease or defect at the time of the incident. We further believe that defendant had the capacity to appreciate the criminality of his conduct and to conform his behavior to the requirements of the law had he so chosen. (Ill. Rev. Stat. 1971, ch. 38, par. 6—2(a).) We find that defendant was guilty beyond a reasonable doubt of all the offenses with which he was charged.

Defendant next argues that his conviction and concurrent sentence for aggravated battery must be reversed since it arose out of the same course of conduct and stemmed from the same motivation as the rape.

■■■ Our supreme court's recent pronouncement in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, is dispositive of this issue. In *King*, defendant was concurrently sentenced for rape and burglary with an intent to commit rape. Defendant contended that his conviction for burglary should be reversed since it was motivated by his intent to commit rape. The court considered the history of the Illinois court's treatment of concurrent and consecutive sentences and its alternate adoption and rejection of the "independent motivation" test, the "separate and distinct act" test, and the hybrid standard which combined the two tests. The court then stated:

"* * * we are aware of no constitutional limitations against multiple convictions and concurrent sentences for different offenses arising from multiple acts which are incidental to or motivated by some greater criminal objective. Multiple convictions and consecutive sentences have been permitted against claims of double jeopardy for offenses based on a single act but requiring proof of different facts. *Gore v. United States* (1958), 357 U.S. 386, 2 L. Ed. 1405, 78 S. Ct. 1280; *Blockburger v. United States* (1931), 284 U.S. 299, 76 L. Ed. 306, 52 S. Ct. 180.

As indicated earlier, the dual standards for determining when multiple convictions and concurrent sentences are permissible have brought about confusing, illogical, and inconsistent results. We, therefore, reject the 'independent motivation' test as a standard for determining whether multiple convictions and concurrent sentences are permissible. Our rejection of this test is limited solely to concurrent sentences.

Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which

are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." 66 Ill. 2d 551, 565-66, 363 N.E.2d 838, 844-45.

■■ Applying this test to the case at bar, we note that the offenses of rape and aggravated battery are based on separate acts and require different elements of proof. Wells presumably incurred the cuts on her legs, during the struggle with the knife which occurred subsequent to the rape. Additionally, the facts disclose that defendant yanked out Wells' hair causing her head to bleed, after he took the gun away from her. This also occurred after the act of rape was completed. Therefore, the conviction and sentence for both the rape and aggravated battery charges was proper. See *People v. Stein* (1977), 51 Ill. App. 3d 421, 366 N.E.2d 629; *People v. Richardson* (1977), 50 Ill. App. 3d 550, 365 N.E.2d 603; *People v. Carroll* (1977), 49 Ill. App. 3d 387, 364 N.E.2d 408.

■■ However, we agree as did the defendant and the State that defendant's aggravated battery sentence must be reduced from 4 to 10 years to 3 1/3 to 10 years. Section 5—8—1(c)(4) of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(c)(4)), proscribes a minimum term no greater than one-third of the maximum when the trial court sets a minimum term in excess of one year.

Accordingly, defendant's conviction for aggravated battery is modified and reduced to 3 1/3 to 10 years. In all other respects, the judgment of the trial court is affirmed.

Affirmed as modified.

DIERINGER, P. J., and ROMITI, J., concur.