THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GEORGE REHBEIN, Defendant-Appellant.

First District (4th Division)   No. 76-985

Opinion filed October 13, 1977.

James Geis, of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Timothy Quinn, and Mary C. Shropshire, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:
Defendant, George Rehbein, was charged with deviate sexual assault

and aggravated kidnapping. (Ill. Rev. Stat. 1975, ch. 38, pars. 11—3, 10—2.) Following a jury trial, in the circuit court of Cook County, defendant was convicted of deviate sexual assault and acquitted of aggravated kidnapping but convicted of the lesser included offense of unlawful restraint. (Ill. Rev. Stat. 1975, ch. 38, par. 10—3.) He was sentenced to concurrent terms of 4 to 10 years for deviate sexual assault and 1 to 3 years for unlawful restraint. On appeal, defendant contends: (1) the prosecutor's cross-examination of him to show that after receiving *Miranda* warnings, he had not told the investigating officer that the victim waved at him first, violated his constitutional right to remain silent and denied him a fair trial; (2) the prosecutor improperly argued facts not in evidence, referring to defendant as a sex maniac, speculating he would have committed other crimes and urging the jury to return guilty verdicts in order to combat the crime wave; and (3) the conviction and sentence for unlawful restraint must be reversed because it arose from the same conduct as the deviate sexual assault charge.

We affirm the trial court.

The victim, a 21-year-old single woman testified that on August 2, 1975, a rainy Saturday morning, she was standing in a doorway at Ashland Avenue and Altgeld at 8:15 a.m., waiting for a bus to take her to work at a hardware store several miles away. A car pulled up and a man she mistook for her upstairs neighbor, "Merle," offered her a ride by pointing with his thumb. She ran to the car and got in. She then recognized that the man, whom she identified in court as defendant, was not her neighbor; and she told him she did not need a ride and could take a bus. At this time the car was moving south on Ashland Avenue. Defendant asked how far she was going on Ashland and she replied she was going to Armitage, 5 blocks south. After 3 blocks, however, defendant turned left on Webster. She told defendant this street was not Armitage, and defendant said he would turn around. He stopped under a viaduct, grabbed her arm and told her he would stab her and beat her if she did not listen to him. He then performed an act of cunnilingus on her. The victim told defendant she lived alone, and, if he took her home, he could do whatever he wanted. He agreed. However, when defendant stopped for a red light at Ashland and Webster, she jumped from the car and screamed. Defendant threw her pocketbook out of the car. She walked behind defendant's car and copied down the license plate number as AC 9513. Defendant drove away and she then went into an auto shop across the street where she was informed that the police had already been summoned.

At the police station she spoke to Chicago Police Investigator Hussion and told him that defendant was wearing dark blue pants and a light blue shirt with paint on it. She described his car as copper-colored and having two doors. That afternoon she accompanied the investigator and Joseph

Minneci, her boyfriend, to defendant's home in Berwyn, and waited outside in a police car. A few minutes after the investigator went in, defendant, wearing the same shirt, approached the car saying he wanted to talk to her.

A certified copy of defendant's Illinois Motor Vehicle registration was admitted in evidence, and it showed that license number AC 9513 was issued to defendant on June 16, 1975, for a 1966 Buick.

Chicago Police Officer James Mellett testified he answered a radio assignment at approximately 8:40 a.m. The victim was "visibly shaken" and had a bruise mark on her upper left arm.

Joseph Minneci testified he worked with the victim at a hardware store. He arrived at the auto shop shortly after the police, and he saw that the victim was in the squad car and she was shaking and crying hysterically. Her clothes were in disarray and she had a black and blue mark on her arm. Later, he accompanied the victim and Officer Hussion to defendant's home in Berwyn. About a minute after Hussion had left the car, defendant approached the car and said, "I want to talk to you" and made a motion with his hand. Minneci, however, locked the door, rolled up the windows and grabbed the victim, who was crying and screaming. The defendant stood at the window, saying, "I want to talk to you about this," then left and returned 5 minutes later with Officer Hussion. The four people then went to the police station in the police vehicle.

Chicago Police Officer James Hussion testified he interviewed the victim at approximately 9:30 a.m. Her clothes were disheveled and she had a bruise on the upper part of her left arm. He called defendant and explained that his license number had become the subject of an investigation and asked if he still had those plates in his possession. Defendant said he still had the plates but they were on a blue Buick which was inoperable and was in his garage and had not been driven for some time. Defendant said he had been home all night. The officer explained he would have to investigate to see if there were two plates on defendant's car. He then went to defendant's home in Berwyn, accompanied by the victim and Minneci, who waited in the car. Defendant told Officer Hussion the car was in the garage and to go out and look at it. Defendant's wife showed him to the garage where he observed a brown or copper-colored Buick covered with raindrops with license plates matching those described by the victim. He immediately walked back to the house and informed defendant the car in the garage was a copper-colored Buick and his plates were affixed to it. Defendant was informed of his constitutional rights. Officer Hussion then "explained" to defendant that the color of his car matched that given by the victim, that the plates matched, and that the car was "covered with rain" indicating it had been recently driven. Defendant denied any knowledge and, after requesting permission to

contact an attorney, made a telephone call. Defendant agreed to go to the police station to talk to an assistant State's Attorney. Defendant was placed under arrest after arriving at the police station.

Defendant testified he was driving in his vehicle on Ashland Avenue and looking in the windows for help-wanted signs, when he observed the complainant who waved to him as he was passing by. He backed up to the intersection and offered her a ride. She agreed and got into the car. She asked him his name and he asked her name. He told her he was in the area looking for a job. After driving a few blocks they approached an industrial area. He asked if it was all right if he turned off Ashland and she told him she was in no particular hurry. He parked under a viaduct and told her she was "cute" and a pretty girl and he could "like her" a lot. She thanked him for the compliment and he put his arm around her and kissed her. He did feel her breast "a little bit from the outside," but denied that he committed an act of deviate sexual conduct. She then suggested they go to her place, but demanded money en route. When he told her he had none, she told him he would be sorry and jumped out of the car. She left her pocketbook and he told her to take it. On cross-examination, defendant denied that he told Investigator Hussion on the telephone that his car was blue, that his car had not been out of the garage all night or that his car was not in operating condition. He claimed he did say he was in the area in the car. During cross-examination the following colloquy took place:

"Q [Assistant State's Attorney]: Now, did you ever tell Investigator Hussion while in your house, that the girl waived [sic] to you first?

A I wanted to seek attorney before I would say anything to anybody.

Q Well, you didn't tell him that, did you?

A Tell him what now?

Q You didn't tell him that the girl waived [sic] to your car first, did you?

A I believe in consulting my attorney before I say anything.

Q Now, is the answer yes or no? You didn't tell the investigator that, did you?

A I asked him that I wanted an attorney. I called for attorney at my home.

Q So, your answer, I take it then, sir, is you did not tell Investigator Hussion—

A I didn't tell him anything.

Q About what you're talking about in court today, is that right?

A I didn't tell him anything, right."

Defendant admitted when he talked to Investigator Hussion on the

telephone he did not tell him the version to which he testified; but he explained the officer had only asked about the license plate numbers, and he only told the investigator that the car was his.

The victim testified in rebuttal that defendant never asked her name, and she did not ask defendant his name. She denied asking defendant for money.

OPINION

As set forth above, during cross-examination, the prosecutor elicited testimony that following his arrest defendant did not tell Officer Hussion that the victim waved to him. Defendant claims the State thereby used his silence at the time of his arrest, after he had been given the *Miranda* warnings, to impeach his testimony contrary to *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. Although defendant did not object on this ground at trial and did not raise the issue in his written motion for a new trial, similar violations of the accused's right to remain silent have been held to be plain error, hence reviewable under Supreme Court Rule 615(a). *People v. Robinson* (1976), 44 Ill. App. 3d 447, 358 N.E.2d 43; *People v. Monaghan* (1976), 40 Ill. App. 3d 322, 352 N.E.2d 295.

Defendant contends that the prosecutor's questions implied that defendant would have told the police about the complainant's having waved to him had this in fact occurred. He suggests the State sought to use his silence on this point against him. In *People v. Wright* (1975), 32 Ill. App. 3d 736, 741, 336 N.E.2d 18, 22, this court said:

"Long before the United States Supreme Court held, in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, that defendants have a right to remain silent in the face of police interrogation, the Illinois Supreme Court held it was error for the State to offer testimony as to defendant's refusal to make a statement. In *People v. Rothe* (1934), 358 Ill. 52, 57, 192 N.E. 777, this refusal had been offered, as here, by the testimony of an officer. As clarification for its reversal, the court stated 'the fact that [the defendants] refused to make a statement had no tendency to either prove or disprove the charge against them. The admission of this evidence was prejudicial, and since it was neither material nor relevant to the issue being tried it should have been excluded.' "

The United States Supreme Court has recently decided that every post-arrest silence by a defendant "is insolubly ambiguous because of what the State is required to advise the person arrested," and, consequently, a defendant's silence at the time of arrest and after receiving *Miranda* warnings cannot be used against him even for impeachment purposes.

*Doyle v. Ohio* (1976), 426 U.S. 610, 617-619, 49 L. Ed. 2d 91, 97-98, 96 S. Ct. 2240, 2244-2245.

■■ The State contends that although defendant was given *Miranda* warnings, he was not entitled to them since he was in his own home in a noncustodial situation, thus making *Miranda* warnings unnecessary. However, defendant has an absolute right to remain silent, whether or not he is advised of his rights under *Miranda*, and he could exercise his rights irrespective of whether he had been given *Miranda* warnings. Thus, whether defendant was entitled to *Miranda* warnings is irrelevant. We conclude that the prosecutor's cross-examination improperly infringed upon his right to remain silent. *Cf. People v. Sepka* (1977), 51 Ill. App. 3d 244, 367 N.E.2d 138, which noted that defendant's silence at a lineup could have represented the exercise of an existing right of which defendant was aware.

The State next contends, citing *People v. Queen* (1974), 56 Ill. 2d 560, 310 N.E.2d 166, and *People v. Kent* (1973), 15 Ill. App. 3d 523, 305 N.E.2d 42, that defendant did not exercise his right to remain silent after being given his *Miranda* warnings. However, the record here shows that the defendant did expressly assert his privilege to remain silent and these cases are, therefore, distinguishable. As the court noted in *People v. Robinson* (1976), 44 Ill. App. 3d 447, 358 N.E.2d 43, the person under arrest does not have to refrain from saying anything in order to preserve his Fifth Amendment rights, since it is his privilege to stop at any point during custodial interrogation to assert his rights. Officer Hussion testified that defendant "denied any knowledge of being involved" and asked to call an attorney after being advised under *Miranda*. This conduct evidences an intention by defendant to assert his rights under *Miranda* and does not evidence an intent to waive those rights.

The State asserts, however, that the testimony about which defendant now complains was volunteered by him and was not responsive to the questions being asked by the State which concerned inconsistencies between defendant's testimony and his telephone conversation of Officer Hussion, not his silence following the *Miranda* warnings. The portion of the record previously set forth contradicts this assertion.

Finally, the State contends the error is harmless beyond a reasonable doubt. It points out that the victim had ample opportunity to observe defendant in his car, that she obtained the license plate number, that she promptly complained of the incident and that her description of defendant and his car proved accurate. Moreover, the State says her boyfriend and two police officers observed her shaken condition which would tend to corroborate her version. While defendant denied any act of deviate sexual conduct and testified the victim did not resist his advances,

the State maintains defendant's testimony was impeached by numerous inconsistencies. It notes that defendant lied to Officer Hussion concerning the color of his car, its inoperable condition and whether it was driven on the morning in question. Thus, the State contends that if credibility was an issue, the State's attempt to show an inconsistency between defendant's silence and his testimony at trial "was merely cumulative and could not have damaged the believability of an already impeached incredible witness."

Violation of a Federal constitutional right does not require reversal where the error is harmless. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) However, as set forth in *Chapman*, error is not harmless where there is a reasonable possibility that it might have contributed to the conviction. (*People v. Smith* (1967), 38 Ill. 2d 13, 230 N.E.2d 188.) The reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. *People v. Brady* (1973), 14 Ill. App. 3d 830, 303 N.E.2d 528.

■■ In the case at bar, the error took place only during cross-examination. The prosecutor did not refer to defendant's silence in his argument to the jury. In *People v. Robinson* (1976), 44 Ill. App. 3d 447, 358 N.E.2d 43, this court found that the error was not harmless beyond a reasonable doubt because the jury might have been persuaded by the improper cross-examination and argument to conclude that if the defendant believed his life was in danger, and thought his belief was reasonable, he would have explained this to the police. In *Robinson*, the defendant's testimony concerning his own beliefs was uncontradicted. Here, however, defendant's testimony was directly contradicted by that of the complaining witness, whose testimony was corroborated in several important respects, and by that of Officer Hussion. We conclude that the error was harmless beyond a reasonable doubt.

Defendant also argues he was denied a fair trial by the State's closing arguments. No objection was made at trial to several of the remarks now complained about. For example, defendant now argues the State commented on facts not in evidence when it said that factories are closed on Saturday although no evidence to this effect was introduced. The general rule is that when defendant does not object to the State's closing argument, he thus waives his right to review, although complaints of seriously prejudicial argument will be considered on review. (*People v. George* (1971), 49 Ill. 2d 372, 274 N.E.2d 26.) Moreover, even improper remarks by the State do not compel reversal where the comments were not "a material factor influencing defendant's conviction." (*People v. Skorusa* (1973), 55 Ill. 2d 577, 585, 304 N.E.2d 630, 634.) Although defendant correctly points out the record contained no evidence that the factories were closed on Saturday, the remarks were not seriously

prejudicial and failure to object thereto waives further consideration of the matter.

There was no objection at trial to several other comments now complained of. Defendant now claims it was improper for the prosecutor to argue that defendant "tried to talk" the victim out of prosecuting the case when there was no evidence to that effect; that the prosecutor should not have argued that the victim's testimony was corroborated and not contradicted. We find these remarks were not prejudicial and any error was waived by defendant's failure to object at trial.

■■ Defendant also argues the State offered its opinion of defendant's guilt but the record does not support this claim, and shows counsel was properly commenting on the credibility of the witnesses. *People v. Franklin* (1976), 42 Ill. App. 3d 408, 355 N.E.2d 634.

■■ Defendant next argues that the following actions were prejudicial: the State's reference to him as a "sex maniac"; remarks implying that defendant, if left to his own devices, would have committed further crimes; and remarks repeatedly "thanking God" for the efficient police investigation and the perseverance of the victim and her friend which led to defendant's apprehension. We find these remarks were fair inferences to be drawn from the evidence at trial. *People v. Stein* (1977), 51 Ill. App. 3d 421, 366 N.E.2d 629.

Defendant also argues that the State's remarks that the jurors could do something about the crime wave by finding defendant guilty were prejudicial. However, similar remarks have been found to be insufficient to require reversal and even proper, if based on the evidence. See *People v. Benedik* (1974), 56 Ill. 2d 306, 307 N.E.2d 382; *People v. Kirkwood* (1973), 54 Ill. 2d 369, 297 N.E.2d 148.

■■ The defendant concedes that the individual remarks of the prosecutor might not constitute error, but that the cumulative effect could only have been prejudicial, and adds that his own counsel abdicated his client's position during closing argument, possibly depriving him of the effective assistance of counsel and accentuating the State's prejudicial remarks. We have examined the entire record and cannot say that the comments complained of, either singly or in the aggregate, constituted reversible error. We also find that defendant's counsel did not abandon his client's position. None of the closing arguments constituted a material factor in defendant's conviction in light of the overwhelming evidence against him. See *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.

Nevertheless, we are constrained to note that the arguments and comments of the State's attorney did border on the inappropriate and prejudicial. To skirt along the line of prejudicial error adds no luster to the role of the State's advocate, whose public function in seeking a just conclusion in a criminal trial is of the highest utility and importance.

According the defendant fairness and moderation in the controversy is an indispensable part of the prosecutor's responsibility. Public respect and acceptance of the State's role in promoting our system of justice can only be diminished where the skill and artfulness of the State's advocate comes closer to foul rather than fair and thereby contains seeds for reversal of the trial court's judgment.

■■ Finally, defendant contends multiple convictions for deviate sexual assault and unlawful restraint were improper because they arose from a single course of conduct. Our supreme court has recently reviewed the principles governing multiple convictions and multiple sentences for offenses committed during the same transaction. (*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.) The court rejected the "independent motivation" test in favor of one that would focus more closely on the acts of the defendant and held that a defendant is prejudiced only when "more than one offense is carved from the same physical act" or, with regard to multiple acts, when "defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses." (66 Ill. 2d 551, 566, 363 N.E.2d 838, 844.) This present case is controlled by the recent decisions of this court in *People v. Stein* (1977), 51 Ill. App. 3d 421, 366 N.E.2d 629, and *People v. Carroll* (1977), 49 Ill. App. 3d 387, 364 N.E.2d 408, in which concurrent sentences for rape and aggravated kidnapping were upheld since both offenses arose from a series of closely related acts, and did not consist of lesser included offenses. Both convictions in the present case are proper.

For the above reasons, the judgment of the Circuit Court of Cook County is affirmed.

Judgment affirmed.

JOHNSON and ROMITI, JJ., concur.