THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DARVIE TATE, Defendant-Appellant.

First District (4th Division)   No. 76-1155

Opinion filed July 27, 1978.

Ralph Ruebner and Andrew Berman, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Timothy Quinn, and Patricia Bender, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendant, Darvie Tate, was found guilty of two counts of aggravated battery (Ill. Rev. Stat. 1977, ch. 38, par. 12—4) and one count of armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2). He was sentenced to a term of 3 to 9 years for both counts of aggravated battery and to a term of 10 to 25 years for armed robbery, the sentences to run concurrently.

On appeal, defendant contends: (1) his constitutional right to remain silent was violated and he was denied a fair trial when the prosecution was permitted to cross-examine him regarding his post-arrest silence; (2) the prosecution made several improper and prejudicial comments during closing and rebuttal arguments which warrant reversal; and (3) while the alleged errors, considered separately, may not have deprived him of a fair trial, their cumulative effect did.

We find the State erred in cross-examining the defendant regarding his post-arrest silence and that the error was prejudicial. Accordingly, we reverse and remand for a new trial.

The complaining witness, Gary Poggemiller, testified that on August 5, 1972, at approximately 8:25 p.m. he entered the Beanery restaurant located at 4900 South Merrimac Street in Stickney Township. Poggemiller stated that he sat down at the restaurant's counter and ordered a cup of coffee. Seated at the counter with him, approximately 15 to 20 feet away, were four men, later allegedly identified as Michael Newman, Nathaniel Williams, Isaiah Sumerall and the defendant, Darvie Tate. While Poggemiller was drinking his coffee, the four men paid their bills and left.

Poggemiller stated that a few minutes had elapsed when he heard a noise emanating from outside the restaurant. When he walked over to the restaurant's front window to investigate, he saw the same four men standing alongside an old black Cadillac, with its trunk hood up. Poggemiller said he then returned to his seat, finished his coffee and paid his bill.

He further testified that two of the four men, Sumerall and Newman, had reentered the restaurant and were standing by the door. Poggemiller asserted that as he reached the door intending to leave, Sumerall grabbed his arm. Also, he said that as he jumped back breaking loose from the hold, Newman threw a brick at him. Sumerall and Newman then drew

knives from their pockets. While Sumerall jumped over the restaurant counter and held his knife to the neck of an employee, Poggemiller stated that Newman chased him through the restaurant and that the defendant and Williams, meanwhile, entered the restaurant through a side door and ordered the employees to lay on the floor.

Poggemiller asserted he was eventually cornered in the restaurant by the defendant and knocked down to the floor on his back. While the defendant held a large knife pointed towards him, another man went through his pockets taking his wallet and keys. One of the men then stated: "Get this guy good because he hit me." Poggemiller contended that the defendant and one of the other men proceeded to stab him several times in the chest and forehead. Poggemiller said that the defendant slit open his neck and that he bled profusely. Two of the men then grabbed money from the restaurant's cash register.

Poggemiller testified that he and the restaurant's employees were then herded to the back of the restaurant where they were locked inside a shed. After waiting approximately three minutes for the four men to leave, one of the employees broke down the door with a meat cleaver he found in the shed. The employees immediately called the police and an ambulance for him.

Poggemiller further testified that he was hospitalized for about a week. Two weeks after the incident had occurred he was shown 12 to 15 photographs. Among the photographs were those of the defendant, Newman, Sumerall and Williams. Poggemiller stated he could not identify, from the photographs, any of the men involved in the armed robbery. At no time was Poggemiller able to furnish the police with a description of any of the four men. About a month after the incident, Poggemiller saw the defendant in court when the defendant was taken out of the lock-up. For the first time, Poggemiller identified the defendant as one of the four men involved in the armed robbery and as one of the men who had stabbed him. Poggemiller also identified the defendant at trial.

Steven Rousey, a special agent with the Illinois Central Gulf Railroad, testified that on August 5, 1972 he was patrolling a railroad yard at 4700 South Merrimac. As Officer Rousey drove past the Beanery restaurant, a restaurant at which he often ate, he noticed a black Cadillac parked out front. The car's trunk was open. Officer Rousey saw a television set in the trunk which he thought resembled the one owned by the Beanery. He also observed a man standing inside the restaurant's doorway.

Officer Rousey decided to investigate. He turned his car around and drove back toward the Beanery. As he approached the restaurant he saw four men in the Cadillac. When he drew near the Cadillac, it sped off. Officer Rousey pursued it. At the intersection of 51st Street and Central

Avenue the Cadillac ran a red light, was struck by a vehicle travelling in the opposite direction and crashed into a traffic pole.

The four men scrambled out of the Cadillac and ran east on 51st Street. Officer Rousey chased the four men on foot. He lost sight of them after a few blocks. Upon returning to his car, he discovered that a Cook County sheriff and a Chicago police officer had apprehended one of the four men, Isaiah Sumerall.

Raymond Hentig, an officer with the Cook County Sheriff's Police Department, testified that he was on duty on August 5, 1972. He stated that he received a radio dispatch that day that an armed robbery had occurred and he was to assist in trying to apprehend four suspects. He was told the suspects had crashed their car at the corner of 51st Street and Central Avenue and fled on foot. When he reached the vicinity of the accident, a passerby told Hentig that a man was hiding in the parking lot of a nearby school. Sheriff Hentig investigated and discovered Nathaniel Williams hiding behind a car in the parking lot. At this time a Chicago police officer joined Sheriff Hentig and the two men placed Williams under arrest.

Sheriff Hentig testified that a young girl then walked up and told him someone was also hiding in the bushes near the school. Hentig walked up to a fence located in front of the bushes, pulled out his service revolver and ordered the man to come out. Isaiah Sumerall emerged holding a T-shirt which contained currency and coins amounting to $46.50. Sumerall was placed under arrest. Sumerall and Williams were transported to the Bedford Park police station.

Isaiah Sumerall was called as a witness for the State. Sumerall had already been tried, convicted of armed robbery and aggravated battery and sentenced for his participation in the same crime for which the defendant was on trial. Two prosecuting attorneys had told Sumerall that if he testified against the defendant they would write a letter to Sumerall's parole board and would also inform the judge who had sentenced Sumerall about his cooperation. Sumerall understood that this might result in a reduction of his sentence.

Sumerall stated that he had known the defendant for nine years and considered him a friend. Sumerall testified that he, the defendant, Michael Newman and Nathaniel Williams were driving around in a 1966 black Cadillac the night of August 5, 1972. The four men drove to the Beanery restaurant to get something to eat. It was about 8:20 p.m.

There were four other people in the restaurant, three employees and Gary Poggemiller. When they finished eating and paid their bills, the four men left the restaurant and sat in the black Cadillac. After a few minutes had elapsed Williams and the defendant got out of the car and walked to the side of the restaurant building. Newman and Sumerall walked toward

the restaurant's front door. On the way to the front door Newman picked up a brick.

As Newman and Sumerall entered the restaurant, Poggemiller was coming out. Sumerall testified that Newman grabbed Poggemiller. When Poggemiller jumped back Newman threw the brick at him. Poggemiller ran toward the back of the restaurant.

Sumerall further testified that the defendant and Williams came into the restaurant through a side door. The defendant began chasing Poggemiller. Newman ran to the kitchen and emerged with a butcher knife. The defendant caught Poggemiller and they struggled. Newman ran up and stabbed Poggemiller. Sumerall testified he then saw the defendant slash at Poggemiller with a knife but he did not see the defendant cut Poggemiller. Then, the defendant and Williams locked Poggemiller and the restaurant employees in a shed. Williams grabbed the restaurant's television set on the way out and put it in the car's trunk. He attempted to close the trunk but the TV was too large to allow the trunk to close. Williams then jumped into the car and drove off.

Sumerall's testimony at this point corroborated Officer Rousey's and Sheriff Hentig's testimony regarding the pursuit of the black Cadillac, its collision at 51st and Central, the chase of the four men on foot, and the capture of Sumerall by Hentig. Sumerall testified further that he was taken to the Bedford Park police station where he was interrogated by Investigator Dirk Lowry.

On cross-examination Sumerall stated that Lowry threatened him at the police station. "[Investigator Lowry] told me if that white boy die he is going to kill me." Then Lowry said "You might as well go ahead and tell me the whole story, I know it anyway." Sumerall also admitted that at the hearing in his own case on the motion to suppress certain evidence, he had testified: "[Investigator Lowry] said if I don't tell him what he wants to know he is going to bust my head." Sumerall stated that he did not tell Lowry everything he told the jury in the instant case.

On redirect examination the prosecutor questioned Sumerall as to what he told Investigator Lowry when he was interrogated:

> "BY MR. PETERSEN: Q. On the night you were arrested you talked to Investigator Dick Lowry, is that correct?
> A. Yes.
> Q. Now, you say you never mentioned the name of Darvie Tate?
> A. I didn't mention it before he mentioned it to me.
> MR. EISEN: Objection
> THE COURT: Overruled. Next question.
> BY MR. PETERSEN: Q. And what did you say when he mentioned the name Darvie Tate?
> A. Said: Yes, I know him.

Q. What did you say about Darvie Tate?
A. I said he was with me."

Dirk Lowry, an investigator with the Cook County Police Department, was called by the State. He stated that he was assigned to investigate an armed robbery and aggravated battery which occurred at the Beanery restaurant on August 5, 1972. As part of his investigation he interrogated Nathaniel Williams and Isaiah Sumerall at the Bedford Park police station the night of August 5. Investigator Lowry asserted that the three employees who were present at the Beanery during the occurrence in question could not be located to testify at trial. On August 16, Investigator Lowry obtained an arrest warrant for the defendant and Michael Newman. Lowry subsequently brought defendant, handcuffed, to court in Oak Lawn, where Poggemiller first identified the defendant. Lowry stated that there is a back door which is to be used for prisoners. However, he could not recall whether he brought the defendant in the back door or through the lobby and the courtroom's front door.

On cross-examination Investigator Lowry testified that when he interviewed the Beanery employees after the incident they would not give any statements and said that they did not want to get involved. Lowry also stated that he obtained fingerprints from inside the Beanery and the black Cadillac. He asserted that none of the prints were matched to the defendant. Investigator Lowry was asked if he told Sumerall during interrogation, "If that white boy dies I'll kill you." Lowry answered that it was possible.

The State called a doctor who testified to the nature of the wounds received by Poggemiller during the armed robbery. The State then rested.

The defendant's parents both testified that on August 5, 1972 at about 3:30 p.m. the defendant and his father returned home from a fishing trip. They stated that the defendant, his wife and two children had recently moved back into their home. The parents testified further that that evening at approximately 7:30 p.m. the defendant had gone to the upstairs rooms of the house to take a bath and go to bed. Shirley Tate, the defendant's wife, testified that when the defendant had finished his bath he came into their bedroom and played with their youngest child. She also said that she fell asleep about this time and later awoke at 9 p.m.; the baby was crying because it was his feeding hour. The defendant was asleep in bed.

The defendant testified in his own behalf. His testimony corroborated that of his parents and wife. He also stated that when he was arrested on August 20, 1972, he was handcuffed and transported first to the 26th and California police station, and then to the Bedford Park station. In response to his own counsel's inquiry as to whether he was interrogated

about the armed robbery following his arrest, the defendant testified:

"A. Well, yes. These, they was telling me things that they were, you know, about it, you know, about it. I say I don't know about it.

Q. Did you continuously deny any participation?

A. Yes. I told them I didn't know nothing about what they was talking about."[1]

The defendant testified that after he was arrested he was eventually taken to the court in Oak Lawn. He stated that Officer Lowry handcuffed him and took him through the front door of the courtroom. When they reached the lock-up door, Officer Lowry left defendant to talk to Poggemiller and his mother who were seated about ten feet away. Lowry then took defendant back to the lock-up. The defendant testified that he was employed at the Garfield Ridge News Agency in August 1972. He also stated that he had never been to the Beanery restaurant.

On cross-examination the prosecutor asked the defendant:

"Q. Mr. Defendant, you were arrested in August of 1972, is that correct?

A. Yes.

Q. That is approximately two and one-half years ago?

A. Right.

Q. Did you ever in that two and one-half years ever tell any, anyone, any police officer, any State's Attorney, the story you have told the ladies and gentlemen of this jury?

Mr. Eisen: Object. Counsel knows there would be no contact with the police.

The Court: Objection sustained. Rephrase your question. There you have too many names. Rephrase your question.

Mr. Petersen: Q. Mr. Defendant, have you ever related the story you told the ladies and gentlemen of the jury to anyone before this date?

The Witness: A. The story I just told to the jury?

Q. Yes. Have you ever told anyone before?

A. I had no reason to, no.

The Court: The answer is no, I have not."

As the State itself implicitly admits on this appeal, the main import of the prosecutor's cross-examination focused the jury's attention on the defendant's failure to personally relate his alibi to the police at the time of his arrest and to the prosecution during the pretrial period. On redirect examination, defense counsel attempted to minimize the apparent

---

[1] Neither the defendant nor Investigator Lowry testified specifically that *Miranda* warnings were given to defendant prior to his interrogation. However, Lowry did testify that he was sure he gave "the rights" to each person he arrested. We agree with the State that this testimony is sufficient to raise an inference that defendant received his *Miranda* warnings prior to his interrogation. The defendant does not contend otherwise.

prejudice caused by the disclosure of defendant's post-arrest and pretrial silence:

> "Q. They asked you if you ever talked to anyone about this case. Did you talk to the police officers that night?
>
> A. No.
>
> Q. Did you tell them that you were not involved in this thing that night?
>
> A. Yes, I did.
>
> Q. When you talked to me did you tell me that you were not involved?
>
> A. Yes."

The State called Jack Lewis, the owner of Garfield News Agency, as a rebuttal witness. He testified that the defendant had not worked for the agency since June 1972. He also stated that he and the defendant had breakfast at the Beanery a number of times.

Following the presentation of all the evidence and after having heard closing arguments, the jury deliberated and found the defendant guilty of two counts of aggravated battery and one count of armed robbery. The trial court conducted a presentence hearing and then sentenced the defendant to a term of 3 to 9 years for both counts of aggravated battery and to a term of 10 to 25 years for armed robbery, the sentences to run concurrently. This appeal followed.

OPINION

■■ Defendant initially contends that the prosecutor's cross-examination of him regarding his post-arrest silence after having received *Miranda* warnings violated his constitutional right to remain silent and deprived him of a fair trial. We agree.

In *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, the Supreme Court confronted the issue of whether impeachment use of a defendant's post-arrest silence after having received *Miranda* warnings violated any provision of the Federal Constitution, a question left open in *United States v. Hale* (1975), 422 U.S. 171, 45 L. Ed. 2d 99, 95 S. Ct. 2133. The *Doyle* court held that if the arrested party has been warned of his right to remain silent, it is fundamentally unfair and a deprivation of due process to utilize the silence which follows, to impeach the accused's alibi, subsequently offered at trial for the first time.

The court reasoned that silence, in the wake of *Miranda* warnings, "may be nothing more than the arrestee's exercise of [his] *Miranda* rights" (426 U.S. 610, 617, 49 L. Ed. 2d 91, 97, 96 S. Ct. 2240, 2244), and that while the warnings contain no express assurance that silence carries no penalty, such assurance is necessarily implicit. However, the *Doyle* court was careful to point out that while post-arrest silence may not be used to

impeach an alibi offered by the defendant for the first time at trial, post-arrest silence can be used for impeachment purposes where that fact is inconsistent with the defendant's trial testimony concerning his behavior following arrest. *Doyle v. Ohio* (1976), 426 U.S. 610, 619-20 n. 11, 49 L. Ed. 2d 91, 98 n. 11, 96 S. Ct. 2240, 2245 n. 11; see *People v. Szabo* (1977), 55 Ill. App. 3d 866, 371 N.E.2d 117.

The prosecution's cross-examination of the defendant in this case violated the dictates of *Doyle*.[2] The prosecution elicited from the defendant the fact that he failed to disclose his alibi to the police when he was arrested. The obvious purpose behind this cross-examination was to convey to the jury two impressions: (1) that if the defendant was innocent as claimed, he would not have remained silent when arrested; and (2) that the alibi defendant testified to at trial was recently fabricated. As both *Hale* and *Doyle* demonstrate, however, an accused's silence in the wake of *Miranda* warnings is not inconsistent with a later assertion of innocence, nor is it inconsistent with an alibi the accused offers at trial for the first time. The prosecutor's impeachment use of defendant's post-arrest silence was error in light of *Doyle* and constituted a deprivation of due process.

■■ The State argues that its cross-examination was proper because the defendant did not exercise his right to remain silent but instead offered a general denial of guilt at his post-arrest interrogation. It appears obvious, however, that by merely denying his guilt while at the same time refusing to otherwise talk to the police, the defendant in no way waived his right to remain silent. As the court stated in *People v. White* (1977) 53 Ill. App. 3d 326, 329, 368 N.E.2d 660, 662:

> "The State appears to be arguing that where a defendant upon arrest offers a denial of guilt without more, any subsequent failure to disclose exculpatory information may be used for impeachment purposes. This is incorrect in the light of *Doyle*. The fifth amendment allows an accused to deny guilt, while at the same time withholding any defenses without that silence being available to impeach him. [Citation.]"

Indeed, by refusing to otherwise talk to the police aside from his denial of guilt, the defendant effectively exercised his right to remain silent (*Miranda v. Arizona* (1966), 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627-28) and insulated himself against the possibility of self-

---

[2] The defendant's trial took place before the Supreme Court rendered its decision in *Doyle*. Since the State has not argued that *Doyle* is inapplicable, we need not reach the issue of whether *Doyle* is to be given prospective application only. (See Ill. Rev. Stat. 1977, ch. 110A, pars. 341(e)(7), 341(f); *People v. Suggs* (1977), 50 Ill. App. 3d 778, 365 N.E.2d 1118.) Even if *Doyle* were not applicable, however, the prosecution's cross-examination would still have constituted error under Illinois law. *People v. Green* (1977), 53 Ill. App. 3d 820, 368 N.E.2d 1129, *appeal allowed* (1978), 67 Ill. 2d 593.

incrimination (see *People v. Rehbein* (1977), 54 Ill. App. 3d 93, 369 N.E.2d 190, *appeal allowed* (1978), 67 Ill. 2d 594).

The line of cases relied upon by the State are clearly distinguishable. (See *People v. Henson* (1978), 58 Ill. App. 3d 42, 373 N.E.2d 852, and cases cited therein.) In those cases, when the defendants were placed under arrest, they did not merely deny their guilt as did the accused in this case. Rather, they gave substantive statements to the police. It was therefore held that since those defendants had decided to answer questions and volunteer information, they could subsequently be impeached by their failure to disclose to the police certain exculpatory information which they testified to for the first time at trial. These cases have no applicability here.

The State next contends that its cross-examination was proper because it was invited by the defendant's testimony on direct. We disagree.

The defendant disclosed on his direct examination the fact that he had made a general denial of guilt at his post-arrest interrogation. A reading of the facts in *Doyle* indicates that this direct testimony did not "open the door" to the prosecution's cross-examination as to whether the defendant disclosed to the police, at the time of his arrest, the alibi he testified to at trial. In *Doyle* the following testimony was elicited from the accused on his direct examination:

> "Q. [By defense counsel.] And you were placed under arrest at that time?
>
> A. [By Doyle.] Yes, I asked what for and he said,—'For the sale of marijuana.' I told him—I didn't know what he was talking about." (*Doyle v. Ohio* (1976), 426 U.S. 610, 622 n. 4, 49 L. Ed. 2d 91, 100 n. 4, 96 S. Ct. 2240, 2246-47 n. 4 (Stevens, J., dissenting).)

Notwithstanding this direct testimony, the *Doyle* court held that it was improper for the prosecution to cross-examine the defendant as to whether he had disclosed to the police, at the time of his arrest, the exculpatory story he related at trial. See *People v. White* (1977), 53 Ill. App. 3d 326, 368 N.E.2d 660.

■■ As indicated previously, the fifth amendment allows the defendant to deny his guilt and at the same time to withhold exculpatory information without that silence being available to impeach him. Therefore, we see nothing improper in allowing the accused to disclose to the jury the fact that at his post-arrest interrogation he denied participation in the charged crime, while at the same time foreclosing the prosecution's impeachment use of defendant's failure to disclose his alibi to the police who arrested him. (*Cf. People v. Saulsbury* (1977), 55 Ill. App. 3d 663, 371 N.E.2d 165.) Defendant's post-arrest silence regarding his alibi is in no way inconsistent with his direct testimony as to his

behavior following arrest. *Doyle v. Ohio* (1976), 426 U.S. 610, 619-20 n. 11, 49 L. Ed. 2d 91, 98 n. 11, 96 S. Ct. 2240, 2245 n. 11.[3]

The State claims that if error was committed, it was harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) The United States Supreme Court has not yet considered the issue of whether a *Doyle* violation can ever constitute harmless error. *Doyle v. Ohio* (1976) 426 U.S. 610, 619-20, 49 L. Ed. 2d 91, 98-99, 96 S. Ct. 2240, 2245.

The Third District Appellate Court, based on the authority of *United States v. Harp* (5th Cir. 1976), 536 F.2d 601, has recently held that the harmless error rule is not applicable to *Doyle* violations. (*People v. Williams* (1977), 45 Ill. App. 3d 769, 360 N.E.2d 151; *People v. Green* (1977), 53 Ill. App. 3d 820, 368 N.E.2d 1129, *appeal allowed* (1978), 67 Ill. 2d 592.) However, a reading of the Fifth Circuit's opinion in *Harp* reveals that no such principle was espoused and that the Third District's reliance on that case appears to be misplaced.

The Fifth Circuit opened its opinion in *Harp* by stating: "[*Doyle*] mandates that we find that the prosecutor's comments on * * * post-arrest silence * * * constitute reversible error * * *." (*United States v. Harp* (5th Cir. 1976), 536 F.2d 601, 602.) The rationale underlying this statement appears further on in the opinion:

"Because the prosecutor's comments struck at the jugular of [defendants'] story, those remarks cannot be classified as harmless." (*United States v. Harp* (5th Cir. 1976), 536 F.2d 601, 603.)

Thus, *Harp* did not hold, as *Williams* and *Green* imply, that a *Doyle* violation is always reversible error. In fact the Fifth Circuit has explicitly interpreted *Harp* as adopting the harmless error rule in *Doyle* type cases. *United States v. Davis* (5th Cir. 1977), 546 F.2d 583, 594, *cert. denied* (1977), 431 U.S. 906, 52 L. Ed. 2d 391, 97 S. Ct. 1701.

The vast majority of Illinois appellate courts have held that a *Doyle* violation is governed by the harmless error rule. See, *e.g., People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898; *People v. Douglas* (1978), 58 Ill. App. 3d 149, 373 N.E.2d 1385; *People v. Rehbein* (1977), 54 Ill. App. 3d 93, 369 N.E.2d 190, *appeal allowed* (1978), 67 Ill. 2d 594;

---

[3] One might argue: (1) that the defendant's direct testimony raised an inference that he not only denied participation in the crime when he was arrested but also told the police the alibi he testified to at trial; and (2) that his post-arrest silence was therefore admissible to rebut this inference. (Compare the inference raised in *United States v. Fairchild* (5th Cir. 1975), 505 F.2d 1378, and *United States v. Griffin* (5th Cir. 1976), 530 F.2d 101; see *People v. Mendez* (1977), 53 Ill. App. 3d 1038, 369 N.E.2d 212.) We do not believe that any such inference was raised in this case. We also note that such an argument as this was implicitly rejected by the Supreme Court in *Doyle.*

130

*People v. Sepka* (1977), 51 Ill. App. 3d 244, 367 N.E.2d 138; but see *People v. Upshire* (1978), 62 Ill. App. 3d 248, 379 N.E.2d 38.

Without deciding whether the admission into evidence of testimony elicited from a defendant in violation of *Doyle* can ever be classified as harmless error, we conclude from a review of the evidence presented here that the admission of testimony concerning the defendant's post-arrest silence was not, in this case, harmless beyond a reasonable doubt.

The evidence is far from overwhelming on the issue of defendant's guilt. It presented a direct conflict between, on the one hand, the testimony of the complaining witness and Sumerall, and, on the other hand, the testimony of the defendant as corroborated by the testimony of his parents and wife.

The complaining witness was never able to furnish the police with a preliminary description of any of the four men involved in the robbery. The best he could remember was that one of the men who stabbed him was wearing a black hat and was taller than the other three men. Two weeks after the armed robbery the witness was shown approximately 15 photographs, among which was a photograph of the defendant. The witness, however, was not able to identify the defendant as one of the participants in the crime. The first time the witness identified the defendant occurred in a courtroom in Oak Lawn a month after the robbery. There was conflicting testimony as to whether the confrontation between the witness and the defendant was unduly suggestive and thereby tainted the identification.

None of the fingerprints taken by the police from either the restaurant or the black Cadillac used by the robbers matched those of the defendant. The only other evidence tying the defendant to the charged offenses was the testimony of Isaiah Sumerall. Sumerall's testimony was suspect and had to be looked at with caution as he admitted he had already been tried, convicted of armed robbery and aggravated battery and sentenced for his participation in the same crime for which defendant was on trial. From conversations with the prosecutors, Sumerall understood that his favorable testimony for the State in this case might result in a reduction of his sentence.

The testimony of the defendant, his parents and his wife accounted for the defendant's presence at the time of the armed robbery. It is true, as the State points out, that the defendant's direct testimony was impeached. But this impeachment involved matters collateral to the defendant's alibi defense.

Viewing the evidence as a whole, it becomes apparent that the credibility of defendant's alibi testimony was a crucial factor in the jury's assessment of his guilt or innocence. (See *People v. Suggs* (1977), 50 Ill.

App. 3d 778, 365 N.E.2d 1118; *People v. Monaghan* (1976), 40 Ill. App. 3d 322, 326-27, 352 N.E.2d 295, 298.) The prosecution's impermissible cross-examination encouraged the jury to believe that defendant's alibi did not exist at the time of arrest but was fabricated afterwards. "[T]here is no possible way of determining the extent to which the improper question caused the jury to disbelieve the defendant. [Citation.]" (*People v. White* (1977), 53 Ill. App. 3d 326, 328, 368 N.E.2d 660, 662.) This problem is compounded by the aura of guilt popularly associated with an accused's exercise of his right to remain silent.

The testimony concerning defendant's silence may well have played a role in the jury's decision to believe the State's evidence over the defendant's alibi defense. (See *People v. Sepka* (1977), 51 Ill. App. 3d 244, 367 N.E.2d 138.) As there is a reasonable possibility that the error committed contributed to the defendant's conviction (*People v. Smith* (1967), 38 Ill. 2d 13, 230 N.E.2d 188), we are unable to conclude that the error was harmless beyond a reasonable doubt (see *People v. White* (1977), 53 Ill. App. 3d 326, 368 N.E.2d 660; *People v. Suggs* (1977), 50 Ill. App. 3d 778, 365 N.E.2d 1118; *People v. Hooker* (1977), 54 Ill. App. 3d 53, 369 N.E.2d 147; *People v. Upshire* (1978), 62 Ill. App. 3d 248, 379 N.E.2d 38). This is especially true when we consider that the prosecution's cross-examination focused not only on defendant's post-arrest silence but also his pretrial silence, when he failed to personally and voluntarily disclose his alibi to the prosecution from the time of his arrest until he testified at trial. See *People v. Wright* (1975), 32 Ill. App. 3d 736, 336 N.E.2d 18; *People v. Patterson* (1976), 44 Ill. App. 3d 894, 896-97, 358 N.E.2d 1164, 1166-67; *Doyle v. Ohio* (1976), 426 U.S. 610, 666 n. 6, 49 L. Ed. 2d 91, 96 n. 6, 96 S. Ct. 2240, 2244 n. 6; *Hayton v. Egeler* (6th Cir. 1977), 555 F.2d 599; *State v. Billips* (Minn. 1978), 264 N.W.2d 137.

In view of our disposition of this appeal, it is unnecessary to reach the additional issues presented. We wish to point out, however, that our careful scrutiny of the State's closing argument discloses that in a few isolated instances its remarks bordered on the improper and prejudicial. We trust that on a retrial of this case, the arguments will be kept within legitimate bounds.

Judgment of conviction reversed; cause remanded for a new trial.

JOHNSON, P. J., and ROMITI, J., concur.