THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARL RIDLEY, Defendant-Appellant.

First District (3rd Division)   No. 1—87—1188

Opinion filed May 23, 1990.

Randolph N. Stone, Public Defender, of Chicago (Richard E. Cunningham, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Gael O'Brien, and Mary Schultz, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, the defendant, Carl Ridley, was convicted of committing the offense of residential burglary and was sentenced to a term of eight-years in the Department of Corrections. On appeal, the defendant contends: (1) the identification evidence was insufficient to prove him guilty beyond a reasonable doubt; (2) the State's use of the defendant's pretrial silence deprived him of a fair trial; (3) he was denied due process of law when the prosecution commented on his failure to call witnesses; (4) the State improperly withheld evidence favorable to the defense; (5) remarks by the prosecution during closing argument deprived him of a fair trial; and (6) the trial judge engaged in improper questioning of witnesses. We have considered the defendant's first contention that the evidence adduced at trial was insufficient to convict (*People v. Frazier* (1984), 127 Ill. App. 3d 151, 152-53, 469 N.E.2d 594; *People v. Taylor* (1979), 76 Ill. 2d 289, 309, 391 N.E.2d 366), and we find that the evidence was sufficient. However, because we agree with the defendant's second and fifth contentions, we reverse the defendant's conviction and remand for a new trial.

The complaining witness, Phyllis Cooper, was a resident at 4215 North Sheridan in Chicago. Cooper testified that on the night of August 13, 1986, she locked her front and back doors and turned off the lights upon going to bed. She awoke at approximately 5:45 a.m. on August 14 and discovered a man wearing white gloves standing at the foot of her bed. She stated that the blinds in her bedroom were open and that sunlight illuminated the room. Cooper testified that the intruder told her he had a gun and ordered her to remain quiet. The

intruder grabbed Cooper's leg and commanded her to turn over and not look at him. Cooper reacted instead of raising herself up, prompting the intruder to push her down and in the process tear off her nightshirt. Cooper still refused to turn over. As the intruder leaned over in an effort to obtain control, Cooper grabbed her curlers from the end table beside her bed and swung them at her assailant. The intruder ran out of her bedroom and exited through the back door. Cooper promptly left her apartment and ran to a neighbor's apartment. The police, who had been called by a neighbor who had witnessed the intruder enter the apartment, arrived a short time later.

Cooper further testified that following the burglary, she recalled an earlier incident where a man had attempted to gain entrance onto the premises of her apartment complex through the main gate. Cooper testified that she had refused him access and that she believed her intruder was the same person. On August 15, Cooper undertook her own investigation by questioning residents to see if anyone could identify her suspect. After talking to several residents, she obtained a name, Carlos Nigril or Nigro, and his phone number from someone named Bart. Another resident told Cooper that the person she described was a former janitor of the building. Cooper turned this information over to a police detective.

Cooper viewed a lineup on August 20 and identified the defendant as the intruder. Cooper stated that Ridley was wearing the same shirt and had the same unusual hairstyle as her assailant. On cross-examination, Cooper testified that she told the police that her assailant was between 5 feet 9 inches and 5 feet 11 inches in height. Ridley is 6 feet 2 inches tall and all the participants in the lineup were seated in order to eliminate any height disparities.

Detective Carey Orr testified that he received a phone number from Phyllis Cooper and that he was able to trace the number to Carl Ridley. Orr further stated that the defendant's address was 4302 North Sheridan, only a block north of the victim's residence. On cross-examination, the detective stated that a neighbor told him that the intruder was a former janitor of the building. On redirect, Orr testified that he was told that the intruder was a friend of a former janitor. Orr had to concede on re-cross-examination, however, that his police report disclosed that the neighbor positively identified the suspect as a former janitor of the building.

The State rested its case, and the defense called Tomika Jones, Louella Smith, Jeffrey Simms, and Beula Posten to establish that the defendant was somewhere else when the crime was committed. Their testimony revealed that the defendant and Simms picked up Jones and

Smith around 10 p.m. on August 13. They stopped at a liquor store and then drove to Simms' residence, located at 9534 South Perry, where Simms lives in the basement of his grandmother's home. Shortly after their arrival, Simms' grandmother, Beula Posten, walked halfway down the stairs and asked for Simms to come upstairs for a moment. Although Posten never actually saw the defendant, she testified that they exchanged greetings and that she recognized the defendant's voice as he had visited her home on numerous occasions. During the course of the night, Ridley and Simms played drinking games with Smith and Jones. Upon finishing the liquor, they altered the rules of the game so that items of clothing were removed. In the early morning hours of August 14, they finally went to bed. The testimony revealed that there were two beds in the basement and, according to Jones, she and the defendant slept together while Simms and Smith slept in the other bed. Smith contradicted Jones, however, testifying that she slept with the defendant. There was additional testimony, however, that the defendant slept with Jones and then switched beds when Jones went upstairs to use the bathroom and Simms left to get a drink of water. When Jones returned and discovered the defendant in bed with Smith, an argument ensued. The argument was quickly resolved. This argument occurred somewhere between 6 a.m. and 7:30 a.m. The defendant's alibi witnesses further testified that sometime between 8 a.m. and 9:30 a.m. they left to visit a doctor's clinic because the defendant had an appointment to have his hand treated for an injury sustained at a construction site where the defendant was employed.

Beula Posten testified that she awoke at 5 a.m. on the morning of August 14 and began pressing a garment. She stated that she saw her grandson and heard the defendant talking downstairs around 6 a.m.

John Moschetto, an investigator for the public defender's office, testified that he drove from Simms' residence to the victim's residence. He calculated the distance to be 19 miles and testified that it took him 35 minutes to travel from Simms' residence to Cooper's residence.

The defendant testified that he has never worked as a janitor and has been employed at the Mayfair Construction Company for three or four years. He denied trying to gain access into the building on the day that Cooper stated she first saw him. Ridley further testified that he was at Simms' residence on the morning of the incident until around 10 a.m. He explained that he injured his hand while on the job and that his attorney advised him to see a doctor at a clinic on Lawrence and Broadway in Chicago. On cross-examination, Ridley testified that he does have a friend named Bart who lives in Cooper's building and has

been in Cooper's building on prior occasions.

The State presented a rebuttal witness, Donzella Nelson, who testified that she was letting her dog out on her back porch around 5:45 a.m. when she observed the defendant enter Cooper's apartment through the back door. She heard screaming and instructed her husband to call the police. Nelson testified that she then observed the assailant exit the apartment and, as he walked away, the assailant saw her. According to Nelson, the intruder spoke to her, saying "That son of a bitch is crazy—I'm telling you, that mother-fucker is crazy." Nelson later identified the defendant in a lineup. Nelson further testified that she had often seen Ridley in the neighborhood and that she too was present when Ridley tried to gain access through the main gate a few days earlier.

In surrebuttal, the defense presented the stipulated testimony of a Mr. Glen Whitcomb from the National Weather Service that on the morning of the incident, sunrise occurred at 5:57 a.m., the skies were overcast and thunderstorms were reported at 8 a.m., 9 a.m. and 10 a.m. that morning.

██ █ The defendant contends that the State impermissibly commented upon his pretrial silence during cross-examination and rebuttal argument in violation of *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. The State argues that the defendant has waived this issue by failing to object at trial. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) This court takes notice of *Doyle* violations under the plain error rule. (*People v. Green* (1979), 74 Ill. 2d 444, 450, 386 N.E.2d 272; *People v. Upshire* (1978), 62 Ill. App. 3d 248, 251, 379 N.E.2d 38.) During the State's case in chief, the prosecutor elicited testimony from Detective Orr that Ridley made a statement after his arrest:

"Q. Now, Officer, did you have an opportunity to have a conversation with Mr. Ridley after you advised him of these Constitutional rights?

A. Certainly.

Q. And what, if anything, did he say to you and what, if anything, did you say to him?

A. After I advised Mr. Ridley of his rights, I informed him of the nature of the allegations made against him. I asked him if he would like to talk about this. He said that he would. At this point, he told me he had absolutely no knowledge of this incident and he did not participate in it in any way, shape, or form."

Then during the defendant's case, the prosecutor sought to impeach Ridley:

"Q. Mr. Ridley, do you remember being taken to Belmont and Western?

A. Yes, I do.

Q. Do you remember after being advised of various rights that you, of telling the police officers that you had nothing to do with the incident ***.

A. Yes.

Q. That's what you said, is that right?

A. Yes.

Q. You had nothing to do with the incident and you don't remember the incident. Is that what you told the officer?

A. Right.

Q. Mr. Ridley, you told the police officer that you didn't know anything about it, that you had nothing to do with it period, is that right, sir?

A. Yes, sir.

Q. But you didn't tell the police officer that just four days before you were in a room with two women naked in bed and another individual did you?

A. No.

MR. GERBER: I have no further questions of this witness, you honor."

The prosecution then argued to the jury during its rebuttal argument that if Ridley was really with his friends on the morning of the crime, he would have told the police where he was and whom he was with. This argument is intended to invite the jury to infer from the defendant's silence that his alibi defense is a recent fabrication. (See *People v. Tate* (1978), 63 Ill. App. 3d 119, 127, 379 N.E.2d 693.) As *Doyle* and its progeny have demonstrated, however, the inference that one's silence is inconsistent with an alibi defense offered for the first time at trial is unreliable.

In *Doyle v. Ohio*, the United States Supreme Court ruled that silence following recitation of the *Miranda* warnings is always "insolubly ambiguous" as such silence may be nothing more than the accused's exercise of his right to remain silent. (*Doyle*, 426 U.S. at 617, 49 L. Ed. 2d at 97, 96 S. Ct. at 2244.) The Court further ruled that implicit in the *Miranda* warnings is the promise that silence will carry no penalty should the accused choose to invoke that right. (*Doyle*, 426 U.S. at 618, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.) Therefore, the Court held that it is fundamentally unfair to permit use of a defendant's silence after inducing him to remain silent. *Doyle*, 426 U.S. at 618, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.

The State argues, however, that there was no *Doyle* violation as *Doyle* does not prohibit inquiries into prior inconsistent statements. (*Anderson v. Charles* (1980), 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182.) If a defendant's trial testimony is inconsistent with statements made to the police, the prosecution may impeach his trial testimony by using his failure to give the same statements to the police. (*People v. Adams* (1981), 102 Ill. App. 3d 1129, 1132, 430 N.E.2d 267.) Although the defendant's first version of events involves silence insofar as it omits facts included in the trial version, use of that silence for impeachment is permissible "because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." (*Anderson*, 447 U.S. at 408, 65 L. Ed. 2d at 226, 100 S. Ct. at 2182.) The State maintains that Ridley's statement denying guilt is inconsistent with his alibi defense. This contention is without merit. There is no inconsistency between the statement Ridley gave to police and his trial testimony. Ridley's statement to the police was nothing more than a general denial of guilt, and a general denial of guilt made upon arrest is not inconsistent with an alibi defense offered for the first time at trial. (*Tate*, 63 Ill. App. 3d at 127.) Accordingly, we hold that the prosecution's use of the defendant's silence was error. We further find that we cannot say this error was harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

■ The defendant further contends that remarks made by the prosecution during closing arguments deprived the defendant of a fair trial. These remarks include: (1) a statement to the jury that in order to believe the defense witnesses, it must find that the State witnesses were lying; (2) a statement injecting the prosecutor's personal opinion regarding the veracity of the defense witnesses; (3) statements not supported by the evidence that the defendant cut his hair just before trial and that he could not remember the day of his arrest; and (4) statements designed to inflame the passions of the jury. The State argues that this issue is waived as the defendant failed to object at trial. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Because the evidence in this case was closely balanced, we conclude that it was plain error for the prosecutor to tell the jury that it must find that the State's witnesses were lying in order to believe the defendant's alibi witnesses.

It is improper for a prosecutor to distort the burden of proof by incorrectly arguing to the jury that it must find the State witnesses were lying in order to acquit the defendant. (*People v. Pegram* (1987), 152 Ill. App. 3d 656, 664, 504 N.E.2d 958; *People v. Roman* (1981), 98

494

Ill. App. 3d 703, 708, 424 N.E.2d 794; *People v. Crossno* (1981), 93 Ill. App. 3d 808, 821, 417 N.E.2d 827; *People v. Cole* (1980), 80 Ill. App. 3d 1105, 1108, 400 N.E.2d 931.) In the instant case, the defendant offered an alibi defense and attempted to convince the jury that he was mistakenly identified by Cooper and Nelson. This is not a case where the testimony of the defense witnesses directly contradicted the testimony of the State witnesses. (*Pegram*, 152 Ill. App. 3d at 664-65; *Roman*, 98 Ill. App. 3d at 707.) Because it was possible that the State witnesses could have been mistaken, it was incorrect to tell the jury that it could not believe the defense witnesses unless it found that the State witnesses were lying.

For the foregoing reasons, we reverse the judgment of the circuit court and remand for a new trial.

Reversed and remanded.

RIZZI and FREEMAN, JJ., concur.